Argued and submitted March 2, affirmed June 14, petition for review denied November 9, 2017 (362 Or 175)

Samuel Joseph PETRILLO,
*Petitioner,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD,
*Respondent.*

Public Employees Retirement Board
365837319; A160397

398 P3d 1006

Stephen C. Thompson argued the cause for petitioner. With him on the briefs was Kirklin Thompson & Pope LLP.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

**DeVORE, J.**

Petitioner seeks judicial review of a final order of the Public Employees Retirement Board (PERB) that allowed the Public Employees Retirement System (PERS) to recoup an overpayment of benefits paid to petitioner as a beneficiary of his late wife's PERS account. Petitioner argues that a 2004 settlement agreement bars PERS from recovering the overpayment and that, under the agreement, the Marion County Circuit Court has exclusive jurisdiction over this dispute. We conclude that the settlement agreement resolved only early claims in prior litigation, does not prevent recovery of the overpayment, and does not deprive PERB of jurisdiction. Therefore, we affirm PERB's final order allowing PERS to collect the overpayment of $4,803.88.

## I. FACTS

A. *Overpayment and Legislation*

Our conclusion rests on a distinction between an overpayment made in 1999 and an underpayment corrected in 2004. For the reasons we will explain, the 2004 correction of the underpayment was what was settled while the 1999 overpayment was not settled. That distinction provides the light for the path through these facts and related cases.

PERB administers PERS. Petitioner's wife became a PERS member before January 1, 1996, and was a Tier One member. When she died in 2002, petitioner became the beneficiary of her PERS account. In 2000, PERB had adopted an order establishing that Tier One member accounts would receive a 20 percent earnings credit for 1999. Several public employers challenged the order in several cases. In 2002, the Marion County Circuit Court found error, vacated the 20 percent crediting order, and directed PERB to issue a revised order to correct the 1999 overpayment. *City of Eugene v. PERB*, Marion County Circuit Court Case Nos. 99C12794, 00C-16173, 99C-12838, 99C-20235. The decision was appealed. *City of Eugene v. PERB*, 339 Or 113, 117 P3d 1001 (2005), *modified on recons*, 341 Or 120, 137 P3d 1288 (2006).

In light of the trial court decision, the PERS Fiscal Division recalculated the earnings credit for 1999 and found that the proper 1999 earnings credit for member accounts

should have been 11.33 percent. *See Arken v. City of Portland,* 351 Or 113, 123, 263 P3d 975 (2011) (reciting that fact).

While appeals were pending, the Oregon legislature passed House Bill (HB) 2003 (2003), the "PERS Reform and Stabilization Act of 2003." Section 10 of HB 2003 addressed, among other things, the 1999 overpayment that was at issue in the appeal noted above. Section 10 required PERB to recalculate members' account balances with an earnings credit of 11.33 percent, rather than 20 percent, for the year 1999. Or Laws 2003, ch 67, § 10, *amended by* Or Laws 2003, ch 625, § 13. The effect of the legislation on the pending appeals was not then known.

B.  *Underpayment and Settlement*

Other parts of HB 2003 became a source of dispute between PERB and PERS members, including petitioner. Among petitioner's differences with PERB was a matter involving an underpayment in the calculation of his wife's death benefit. Previously, PERB had told petitioner that the interest rate for death benefits was eight percent. Interest ran "from the date of death to the date of distribution if distributed in a partial or total lump sum payment." Initially, petitioner elected to defer distribution of his wife's death benefit. After the 2003 legislation, however, PERB told petitioner that, due to a deficit in the PERS fund, the 2003 legislation prevented any future interest from being paid to the beneficiaries of deceased Tier One members. PERB told petitioner that no interest would be credited to beneficiaries' accounts and that the decision was retroactive to January 1, 2003. Under protest, petitioner notified PERS that he was withdrawing his wife's account to be rolled-over into his Individual Retirement Account (IRA), and he did so.

Petitioner then filed a petition for judicial review in the Supreme Court, challenging the constitutionality of particular provisions of HB 2003 regarding interest earnings allocations. Significantly, petitioner did not squarely or directly raise the 1999 overpayment issue. In particular, his petition for judicial review did not challenge section 10 of HB 2003. Instead, his petition referenced only section 14b which involved various means of recouping the 1999

overpayment. In time, his petition was consolidated into a proceeding known as the *Strunk* litigation. *See generally Strunk v. PERB*, 338 Or 145, 108 P3d 1058 (2005).

In 2004, petitioner settled out of the *Strunk* litigation individually while the case was still pending in the Oregon Supreme Court. The parties to the settlement agreement were petitioner, PERB, the state, petitioner's employer, and his wife's former employer. For his part, petitioner agreed to dismiss the claims in his petition for judicial review. In exchange, PERB reinstated the PERS account of petitioner's wife and allowed petitioner to return the previously distributed death benefit. He transferred the funds from his IRA back to the reinstated PERS account. In addition, PERS provided a credit for interest on that death benefit calculated at 22 percent for 2003. Thus, contrary to prior announcements, PERB credited petitioner's account with $59,101.56 in interest. The interest was added because PERB had reversed itself and adopted a rule that allowed a deceased Tier One member's account to receive the same interest earnings allocation as Tier Two members.

The settlement limited its effect on petitioner insofar as the settlement provided that petitioner would be entitled to the benefit of the final resolution of the *Strunk* litigation, like any other Tier One member. Only petitioner's claims were dismissed. He was not precluded from bringing claims *other than* those in his petition. Finally, the settlement agreement did not provide a release or waiver of any claims of PERB against petitioner, known or unknown.[1] In short, the settlement agreement expressed petitioner's release of his pleaded claims in exchange for reinstatement of his wife's PERS account with interest.

As it happened, the Supreme Court decided *Strunk* in 2005 shortly after petitioner settled out of the same litigation. 338 Or 145. Although the decision does not affect our view of petitioner's 2004 settlement agreement, we note that the decision did determine that Tier One members had

---

[1] The nature of the proceeding in the Supreme Court was circumscribed by the 2003 legislation that had conferred original jurisdiction on that court to determine the validity of the legislation. *See Strunk*, 338 Or at 151 (citing Oregon Laws 2003, ch 625, §§ 17(1), 17a).

a statutory, contract right to annual cost of living adjustments (COLA). *Id.* at 221-22. Consequently, the court invalidated the COLA freeze mechanism that the legislation had included as one of the means to recoup the overpayments in 1999. *See Arken*, 351 Or at 127 (making that characterization).

## C.   *These Proceedings*

Later in 2005, the Supreme Court concluded in *City of Eugene* that the appeal was moot as a result of a settlement between PERB and public employers after the 2003 legislation. 339 Or at 128. Subsequently, the Supreme Court vacated the trial court decision. *City of Eugene v. PERB*, 341 Or 120, 127, 137 P3d 1288 (2006). Nevertheless, PERB was constrained to follow the same directive because "the PERS reform legislation [had] effectively codified the 11.33 percent figure as the correct 1999 crediting decision." *Arken*, 351 Or at 123. Relying on that legislation, PERB issued an order to recalculate earnings credit for 1999 at 11.33 percent, rather than the original 20 percent rate, while notifying PERS members, former members, and beneficiaries who were affected by the repayment. Petitioner received such a letter in 2012 advising him that PERS anticipated beginning recovery efforts shortly. In response, petitioner asserted that the 2004 settlement agreement had settled the 1999 overpayment dispute. PERS conducted a review but determined that the 2004 settlement agreement did not apply so as to bar the recovery of the overpayment.

Unconvinced, petitioner filed a petition for a contested case hearing, alleging that PERS' determination violated the terms of the settlement agreement. PERB filed a motion for summary determination, arguing, as a matter of law, that PERS made the 1999 overpayment to petitioner's wife, that PERS had the statutory authority to recover the overpayment, and that the 2004 settlement was no bar to recovery. Petitioner contended that, in executing the 2004 settlement agreement, the parties intended that his wife's death benefit was final. Although he had sought a contested case hearing, petitioner also disputed PERB's jurisdiction based upon a provision of the 2004 settlement agreement that provided that any action arising out of the 2004

settlement agreement was subject to the exclusive jurisdiction of the Marion County Circuit Court.

After a hearing, the administrative law judge (ALJ) granted PERS' motion for summary determination and denied petitioner's cross-motion to dismiss for lack of jurisdiction. On review, PERB issued its final order, affirming the ALJ's decision to grant summary determination and deny the motion to dismiss for lack of jurisdiction. PERB adopted the ALJ's opinion, including the ALJ's interpretation of the 2004 settlement agreement. PERB determined that there was no ambiguity in the agreement that would allow the agreement to prohibit recovery of overpayment, and, if there was ambiguity, then extrinsic evidence reflected that the 2004 settlement agreement did not concern the 1999 overpayment.

## II. LAW

An appeal from a motion for summary determination is "the administrative equivalent of a motion for summary judgment." *Bowen v. PERB,* 227 Or App 444, 447, 206 P3d 232, *rev den,* 346 Or 589 (2009). We review PERB's final order affirming the ALJ's summary determination to determine whether the "pleadings, affidavits, supporting documents (including any interrogatories and admissions) and the record in the contested case show that there is no genuine issue as to any material fact that is relevant to resolution of the legal issue as to which a decision is sought" and whether PERS, the agency filing the motion, "is entitled to a favorable ruling as a matter of law." OAR 137-003-0580(6)(a), (b). "[A] party is entitled to summary judgment in a contract action only if the terms of the agreement are unambiguous." *Grants Pass Imaging & Diagnostic Center v. Marchini,* 270 Or App 127, 132, 346 P3d 644 (2015).

Whether the terms of an agreement are ambiguous is a question of law. *Id.* We apply "the familiar three-step analysis described in *Yogman v. Parrott,* 325 Or 358, 361, 937 P2d 1019 (1997), for analyzing contracts." *Copeland Sand & Gravel v. Estate of Angeline Dillard,* 267 Or App 791, 794, 341 P3d 189 (2014), *adh'd to on recons,* 269 Or App 904, 346 P3d 526 (2015); *Brunick v. Clatsop County,* 204 Or App 326, 338,

129 P3d 738 (2006) (applying the *Yogman* framework to a settlement agreement). We begin by examining the text, context, and extrinsic evidence of "the circumstances underlying the formation of the contract." *Nixon v. Cascade Health Services, Inc.*, 205 Or App 232, 238, 134 P3d 1027 (2006) (internal quotation marks omitted). If, based on our review, we conclude that the terms of the 2004 settlement agreement are clear, we construe those terms as a matter of law. *Madson v. Oregon Conf. of Seventh-Day Adventists,* 209 Or App 380, 383, 149 P3d 217 (2006). Alternatively, if the contract remains ambiguous, "summary judgment is not appropriate unless there are no factual disputes regarding relevant extrinsic evidence." *Butler Family LP v. Butler Brothers, LLC*, 283 Or App 456, 464, 388 P3d 1135 (2017). Finally, if ambiguity remains and there are no factual disputes, the court then applies relevant maxims of construction. *Id.*

Both petitioner and PERB contend that the terms of the 2004 settlement agreement are unambiguous, yet reach opposite conclusions whether the agreement permits or precludes PERS' recovery of the overpayment.[2] PERB asserts that Oregon statute provides authority to recoup an overpayment. In particular, ORS 238.715(2) provides:

> "Any person who receives a payment from the Public Employees Retirement Fund and who is not entitled to receive that payment, including a member of the system who receives an overpayment, holds the improperly made payment in trust subject to the board's recovery of that payment under this section or by a civil action or other proceeding."

Despite the statute, petitioner contends, "The parties settled [the 1999 overpayment] dispute by agreeing to allow [petitioner] to retain [his] Wife's benefit without diminishment."

---

[2] Petitioner has not argued any other reasons why summary determination was improper. He has not argued that the terms of the settlement are ambiguous or that there is competing extrinsic evidence that creates a genuine issue of material fact. *Copeland Sand & Gravel*, 267 Or App at 797 ("As a general rule, summary judgment is not appropriate in a contract dispute if the terms are ambiguous."); *Dial Temporary Help Service v. DLF Int'l Seeds*, 255 Or App 609, 612, 298 P3d 1234 (2013) ("[I]t is the existence of competing extrinsic evidence—and the triable factual issue that the evidence creates—that, as a general rule, makes the resolution of the meaning of an ambiguous contract on summary judgment inappropriate[.]").

Our determination of the principal dispute, whether the 2004 settlement agreement precludes recovery of the overpayment, will determine the related dispute, whether PERB lacked jurisdiction to interpret a dispute about the agreement.

Petitioner identifies Paragraph One as his best evidence that the 2004 settlement agreement governs the overpayment dispute. In relevant part, Paragraph One states:

> "PERB will reinstate [petitioner's wife's] account at PERS. The *death benefit amount* distributed by PERS to [petitioner], plus any interest earned on the death benefit, shall be rolled over from [petitioner's] IRA into [petitioner's wife's] reinstated PERS account. PERB and/or Respondents will then credit to the reinstated account within 10 days of the effective date of this Agreement the sum of $59,101.56, representing the 22% interest allocated to deceased Tier I member accounts for 2003 by PERS by virtue of the rule change adopted by PERB in December, 2003, as referenced above. In addition, Respondents agree that [petitioner's wife's] reinstated account at PERS will continue to receive earnings allocations from January 1, 2004 into the future in the same manner as other deceased Tier One member accounts under the rule change until her account is distributed."

(Emphasis added.) Petitioner argues that the phrase "death benefit amount" necessarily "included the full 20 percent earning credit originally authorized by PERS in 1999." He contends that the agreement's term "death benefit amount" should include the 20 percent credit in 1999 because a statute, ORS 238.390, defines "death benefit" to include "the amount of money, if any, credited at the time of death to the member account * * *." Petitioner insists that ORS 238.390 necessarily means that "the entirety of a non-retired decedent member's account, as it exists at the time of death, shall be paid to the decedent's beneficiary."

Petitioner's reliance on the term "death benefit amount," in itself, is troubled for a number of reasons. First, to the extent that petitioner suggests that ORS 238.390 might itself proscribe recoupment of an overpayment, the contention was not presented before PERB and would be a new issue that cannot be presented for the first time in a reply brief on appeal. *See* ORAP 5.45(1) (necessity to

preserve error below); *see also Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991) (refusing to consider contention arising in reply brief).

Second, to the extent that petitioner suggests that the simple reference to the "death benefit amount" necessarily means that he will "retain [his] Wife's benefit without diminishment," his conclusion is not self-evident. He does little to explain why—without more language—that conclusion should be self-proving.

Third, context reveals that Paragraph One has other purposes. The text that follows "death benefit amount" reflects that the agreement concerned the underpayment of interest earnings allocations in 2003—a separate matter from the recovery of the 1999 overpayment. Paragraph One provides that (1) the PERS account of petitioner's wife will be reinstated, (2) the account will receive $59,101.56 as the 22 percent interest for 2003 (an underpayment), and (3) the account will receive future interest earnings allocations like accounts of other deceased Tier One members. None of those operative terms addresses the 1999 overpayment, let alone forbids the recovery of that overpayment.

Next, looking to context, we consider the agreement's opening recitals. After reciting that petitioner had filed a petition in the *Strunk* litigation, the agreement recounts events that led to the underpayment of interest earnings for 2003. The agreement recites that PERS informed petitioner that no interest would be credited to his wife's account after January 31, 2003, and that petitioner had withdrawn or caused the death benefit to be distributed. The agreement recites that PERB reversed itself and, by rule, provided interest earnings for 2003. The recitals explain why the account of petitioner's wife would need to be restored and why 2003 interest earnings would be added. Nothing, however, suggests that the parties had a concern for the 1999 overpayment or for its recovery. As a result, neither Paragraph One nor the related recitals, provide any support for an implied prohibition on recovery of the 1999 overpayment.

PERB points to the limited scope of Paragraph Six, which concerns a specific and limited release of petitioner's claims. That provision states:

"The parties agree that under no circumstances shall this Settlement Agreement and Release of All Claims be construed to release, cancel, limit or effect the ability of [petitioner] to participate in and benefit from any pending or future litigation in state or federal court regarding the legality of House Bill 2003 and House Bill 2004, including any benefit derived from the Strunk case referenced above. Respondents agree that despite this Settlement Agreement and Release, [petitioner] will be entitled to receive the same benefits and treatment as any other Tier One member of PERS upon final resolution of the Strunk case. Furthermore, this Agreement shall not preclude [petitioner] from initiating or participating in any suit or action against respondents that is based upon claims or legal theories other than those set forth in [petitioner's] petition and specifically released by this Agreement."

That provision refers to the agreement using the words, "Settlement Agreement and Release of All Claims," which, in context, is a release of all claims that petitioner had pleaded in the *Strunk* litigation. He was not precluded from bringing other claims. Importantly, the provision did not include a release of claims, known or unknown, of PERS against petitioner. Nothing referred to the 1999 overpayment issue pending in the *City of Eugene* litigation. Nothing limited the ability of PERB to correct its past overpayment. Thus, what is most conspicuous about Paragraph Six is what it does not say. And, what it does say does not imply a prohibition on PERS' recovery of an overpayment.

Before reaching a conclusion, we look beyond the immediate text and context of the settlement agreement. At the first level of analysis, we may also consider "evidence" of the circumstances underlying the formation of the agreement. We have noted:

"The distinction between the extrinsic evidence that can properly be considered at the first, as opposed to the second, *Yogman* level is, as a practical matter, less than clear. Although ORS 42.220 limits consideration at the first level to evidence of the 'circumstances under which the agreement was made,' the case law offers little guidance as to what evidence so qualifies. Nevertheless, it would seem that the *nature of the underlying litigation that was the object of the parties' settlement* would constitute such a 'circumstance.'"

*Nixon,* 205 Or App at 241 n 10 (emphasis added). In that way, we consider the nature of the *Strunk* litigation, petitioner's claims in that litigation, and the *City of Eugene* litigation, then pending.[3]

As noted, the *Strunk* litigation involved consolidated contractual and constitutional challenges to the legislature's 2003 PERS reform legislation, HB 2003 and HB 2004. 338 Or at 150. *Strunk* held that the provisions of HB 2003 that "eliminate the annual assumed earnings rate credit to PERS Tier One members' regular accounts impair a contractual obligation of the PERS contract in violation of Article I, section 21, of the Oregon Constitution" and that section 10(3) of HB 2003 breached an obligation of the PERS contract by temporarily suspending annual COLAs to the service retirement allowances of certain retired Tier One members. *Id.* at 150-51. Read carefully, *Strunk* did not bar PERS from recouping the 1999 overpayment in this case but, rather, *Strunk* invalidated the means of recovering the overpayment by freezing COLAs. *Arken,* 351 Or at 127. Thus, the *Strunk* litigation, which underlies the 2004 agreement, did not put at issue PERS' ability to recover the overpayment. Petitioner does not contend otherwise.

Petitioner's claims in that litigation did not squarely or directly put at issue the proper rate of earnings in 1999. That is, he did not challenge section 10 of HB 2003, the provision that requires PERB to credit member accounts with 11.33 percent earnings, rather than 20 percent earnings, for 1999. Instead, he challenged sections 1, 5, 6, 7, 8, 14b(1)(b), and 14b(2) of HB 2003 and certain sections of HB 2004. At most, he challenged section 14b of HB 2003, which established methods for recovering the overpayment. Even so,

---

[3] We recognize that the ALJ's order and PERB's brief discussed this evidence at *Yogman*'s second level, as extrinsic evidence of the parties' intent. Based on our case law, we address it at the first *Yogman* level.

Because we determine, based on the first level of the analysis, that the 2004 settlement agreement is unambiguous, we do not consider additional extrinsic evidence of the parties' intent or relevant maxims of construction. *Madson,* 209 Or App at 383 ("If, based on that examination [of the text and context] and a review of the circumstances of the contract's formation, the meaning of the provisions is clear, we construe the terms as a matter of law."); *Yogman,* 325 Or at 361 (After the court examines the text and context, "[i]f the provision is clear, the analysis ends.").

those were claims he agreed to dismiss, and nothing implicit in his dismissal suggests that PERB would be precluded from correcting its 1999 overpayment.

Of more significance is the case that is not mentioned in the settlement agreement. The trial court decision in the *City of Eugene* litigation determined that PERB had abused its discretion by crediting 20 percent interest to Tier One members' accounts in 1999. The court ordered PERB to issue new rate orders. *Strunk*, 338 Or at 215. Because the appeals from the court's decision were pending at the time of the 2004 settlement agreement, they were among the circumstances in which this settlement agreement was made. If, as petitioner claims, his settlement agreement had intended to resolve, for purposes of his wife's restored PERS account, a dispute whether there was an overpayment in 1999, then the parties would likely have expressed that intent in the written terms of their agreement.[4] It is implausible that the parties would have intended to resolve a substantial overpayment issue with silence, implicitly, and without any mention of the 1999 overpayment, the correcting 2003 legislation, or the pending *City of Eugene* litigation. We consider the agreement's silence on the issue to be significant.

Accordingly, we conclude that the 2004 settlement agreement does not bar PERS from recovering the 1999 overpayment from petitioner's account. It follows that a recovery by PERS does not "arise out of the interpretation or implementation" of the settlement agreement and that the PERS recovery is not a dispute that would be subject to the agreement's provisions on venue and jurisdiction in Marion County Circuit Court. In sum, PERB did not err in its final order affirming summary determination permitting recovery of overpaid benefits of $4,803.88.

Affirmed.

---

[4] There is no dispute that the 2004 settlement agreement does not specifically address the 1999 overpayment. Petitioner acknowledges that "[t]he Agreement does not specifically mention the 1999 earnings."