SHORR, J.
*777 This case involves claims for breach of contract and unjust enrichment brought by a group of property developers against the City of Eugene. Plaintiffs had received permission from the city to develop a 23-acre property with residential and commercial units. As part of the development process, plaintiffs agreed to undertake certain improvements to the transportation infrastructure near the development. Plaintiffs' claims are based on allegations that the city failed to fully reimburse plaintiffs, as agreed in a letter, for approximately $ 1.3 million in "system development charges" (SDCs) based on SDC credits that plaintiffs would generate through those infrastructure improvements. The trial court granted the city's motion for summary judgment on plaintiffs' claims for breach of contract and unjust enrichment. For the reasons explained below, we affirm, concluding that (1) the letter agreement does not contain a promise by the city to pay plaintiffs $ 1.3 million but only an estimate of the SDC credits that plaintiffs would receive from the infrastructure improvements and (2) the city was not unjustly enriched under the circumstances of this case.[1]
I. BACKGROUND
This case turns on whether the city was obligated to reimburse plaintiffs for SDC credits generated during the course of the development project. We begin with an explanation of the applicable laws governing SDCs and SDC credits. We then summarize the material facts, consistently with our standard of review of a grant of summary judgment, in the light most favorable to plaintiffs as the nonmoving party. Evans v. City of Warrenton , 283 Or. App. 256, 258-59, 388 P.3d 1167 (2016).
SDCs are fees that cities may charge developers to account for the increased demand on certain infrastructure systems caused by *1119 new development. ORS 223.299(4)(a). Cities typically assess SDCs for "capital improvements" associated with the new development. Capital improvements are *778 defined by statute as public assets or facilities used for the following city infrastructure systems:
"(A) Water supply, treatment and distribution;
"(B) Waste water collection, transmission, treatment and disposal;
"(C) Drainage and flood control;
"(D) Transportation; or
"(E) Parks and recreation."
ORS 223.299(1)(a).
Cities that assess SDCs must also provide developers with credits against those fees for the construction of a "qualified public improvement," i.e. , "a capital improvement that is required as a condition of development approval." ORS 223.304(4). By default, SDC credits offset only like-kind SDCs charged for the type of improvement being constructed. ORS 223.304(5)(a).[2] In other words, SDC credits are system-specific, and credits generated as a result of a qualified public improvement in one type of system-transportation, wastewater treatment, and so on-cannot be applied to offset SDCs assessed as a result of a development's effects on a different system. Developers can, however, bank excess credits to offset like-kind SDCs assessed in subsequent phases of the same development. ORS 223.304(5)(c).[3] Notwithstanding that default restriction, local governments have the option to establish a system for the transferability of credits between infrastructure systems "if a local government so chooses." Id .
*779 The Eugene City Council has adopted code provisions governing the city's imposition of SDCs on developers as well as the generation of SDC credits. Eugene Code (EC) 7.700 - 7.740. The city council enacted the city's SDC scheme to "impose an equitable share of the public cost of capital improvements upon those developments that create the need for or increase the demands on capital improvements." EC 7.700.
The city's SDC scheme largely duplicates the scheme provided by state law. Developers in Eugene can accrue SDC credits by making qualified public improvements associated with a development project. EC 7.730(4). As under state law, SDC credits under the city code are awarded on a system-by-system basis and offset only like-kind SDCs associated with burdens on a particular infrastructure system, such as stormwater, wastewater, or, as in this case, transportation. Id . Developers may bank excess credits for subsequent phases of the same development project but cannot transfer credits to other projects or between systems. EC 7.730(6), (7).
Notably for this case, the city code expressly prohibits developers from transferring credits approved for one type of capital improvement to offset SDCs associated with burdens on a different system. EC 7.730(4) ("The credit provided for by this subsection shall apply only to the improvement fee imposed for the type of improvement being constructed."). For example, if a developer generates transportation SDC credits, it may use those credits to offset only transportation SDCs up to but not exceeding the sum total of transportation SDCs assessed for the entire development project. The developer may not use those credits to offset SDCs assessed as a result of effects on other city infrastructure systems, such as wastewater or stormwater sewer systems, even if the total number of SDC credits for any system exceeds *1120 the total SDCs for that system. The city did not elect, in other words, to provide for transferability of credits despite having that option under ORS 223.304(5)(c). Thus, although a developer may receive SDC credits in excess of the total SDCs assessed in any particular system over the life of a development project, the city code prohibits the city *780 from reimbursing the developer for credits that exceed the SDCs associated with that system or allowing the developer to transfer those credits to SDCs in other systems. EC 7.730(4), (7).
In this case, the development project consisted of a 23-acre plot known as Goodpasture Island with an apartment complex, a senior-housing facility, and commercial units. The city conditioned its approval of the development project on plaintiffs' agreement to undertake capital improvements to off-site infrastructure, including widening the Goodpasture Island Bridge and building a new bridge nearby. Under the city code, plaintiffs' capital improvements would be eligible for SDC credits, in an amount calculated by the city, that plaintiffs could use to offset like-kind SDCs assessed by the city. The bridge improvements qualified for transportation SDC credits.
When they learned that they would be required to undertake the bridge improvements, plaintiffs sought additional funds from their lenders to cover the associated costs. At plaintiffs' request, the city provided a letter agreement that plaintiffs could share with their lenders, which in part explained that plaintiffs would be assessed SDCs as part of the development project and receive SDC credits for the bridge improvements. The letter agreement, which is discussed in greater detail below, included the city's "best estimates based on presently available information" of SDCs and SDC credits. The city estimated that the total to be paid by plaintiffs in permits and SDCs for the development project was $ 4,544,046, while the bridge improvements would generate an estimated $ 1.3 million in SDC credits. Those estimates were "subject to further refinement," and the actual amounts would be "determined in the normal course of building permit submittal and approval."
Following completion of the bridge improvements, the city calculated that plaintiffs had earned $ 1,133,643.29 in transportation SDC credits. The city also calculated that the transportation SDCs assessed and collected for the development project totaled only $ 375,768.91. The city informed plaintiffs that, pursuant to the SDC scheme set forth in section 7 of the city code, the city was able to *781 reimburse plaintiffs up to, but not beyond, the total transportation SDCs, notwithstanding that plaintiffs had accrued more than $ 757,000 in additional transportation SDC credits. The city explained that plaintiffs could bank those remaining credits for 10 years for potential future use, but, under the city code, the city was unable to reimburse plaintiffs for credits that exceeded the total system-specific SDC. As a practical matter, however, plaintiffs had no use for the banked SDC transportation credits because plaintiffs had completed the development project and there were no further anticipated transportation SDCs to offset with transportation SDC credits.
After the city limited plaintiffs' use of the transportation SDC credits, plaintiffs initiated the present action, alleging claims for breach of contract and unjust enrichment. As to the first claim-breach of contract-plaintiffs alleged that the city had entered into a binding agreement to pay plaintiffs for approximately $ 1.3 million in SDC credits in exchange for plaintiffs undertaking the bridge improvements and that the city had breached that agreement when it reimbursed plaintiffs only $ 375,768.91. As to the second claim-unjust enrichment-plaintiffs alleged that the city had obtained benefits from plaintiffs in the form of infrastructure improvements and was unjustly retaining those benefits without having to pay plaintiffs for funding and building those improvements.
The city moved for summary judgment on both claims. With respect to plaintiffs' breach of contract claim, the city argued that the letter agreement did not amount to a promise to pay plaintiffs $ 1.3 million but, rather, provided only estimates of total SDC credits that plaintiff would receive. Moreover, the city contended that it was prevented by the *1121 city code from reimbursing plaintiffs for credits that exceeded like-kind SDCs.
Plaintiffs responded that the text of the letter agreement demonstrates that the city intended to deviate from the city code to reimburse plaintiffs for an estimated $ 1.3 million in transportation SDC credits, regardless of the total transportation SDC. Plaintiffs argued that, while the letter agreement might require the city to determine the *782 amount of SDC credits plaintiffs would receive consistently with the city code, the city had agreed to deviate from the code with respect to how it applied those credits. At the very least, plaintiffs argued, the city had failed to show that the letter agreement unambiguously supported its position, which meant that summary judgment was not appropriate on the breach of contract claim.
With respect to the unjust enrichment claim, the city argued that nothing "unjust" had occurred. That is, under the terms of the letter agreement, plaintiffs did not have a reasonable expectation that they would be paid $ 1.3 million, because they were aware of the SDC credit scheme in the city code and knew that the letter agreement included only nonbinding estimates. Further, the city contended that plaintiffs had actually received $ 1.13 million in transportation SDC credits, which was close to the estimated credit total in the letter agreement.
Plaintiffs responded that the city had failed to prove that, as a matter of law, no injustice had resulted from the city's refusal to reimburse plaintiffs approximately $ 1.3 million. Plaintiffs argued that both they and the city reasonably expected that the city would actually pay plaintiffs approximately $ 1.3 million, not that the city had promised only to provide approved SDC credits of approximately that amount. Again, plaintiffs argued that that at least presented a genuine issue of fact that must be resolved at trial.
The trial court granted the city's motion for summary judgment on both claims. As to the breach of contract claim, the court determined that the letter agreement was unambiguous and that the disputed provision, viewed in the context of the agreement as a whole and under the circumstances of its execution, "cannot be construed as a promise to pay $ 1.3 million but merely as an estimate of SDC credits that would be applied to the project." As to the unjust enrichment claim, the court determined that "plaintiffs cannot prevail on this claim because there was no injustice-plaintiffs received a SDC credit of $ 1.13 million in line with the estimate set forth in the letter agreement." Furthermore, plaintiffs' "subsequent inability to immediately use all of the credits is the result of the application of law all parties *783 were made aware of before they entered into the letter agreement."
Plaintiffs appeal, reprising the arguments they made below. When a case is before us following a trial court order granting a motion for summary judgment, we review the record to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. Evans , 283 Or. App. at 258, 388 P.3d 1167. We will affirm if we determine that, viewing all relevant facts and reasonable inferences in the light most favorable to the nonmoving party-here, plaintiffs-no reasonable juror could return a verdict for the nonmoving party on the matter that is the subject of the motion for summary judgment. Id. at 258-59, 388 P.3d 1167.
II. ANALYSIS
A. First Assignment of Error-Breach of Contract
Plaintiffs first argue that the trial court erred in granting the city's motion for summary judgment because, at the very least, the SDC credit reimbursement provision of the letter agreement is ambiguous. In general, the construction of a contract is a question of law, as is the initial question of whether a contract is ambiguous. Yogman v. Parrott , 325 Or. 358, 361, 937 P.2d 1019 (1997). However, a dispute over the meaning of a contract provision is not suitable for summary judgment if the provision is ambiguous because that raises a question of fact. PGF Care Center, Inc. v. Wolfe , 208 Or. App. 145, 151, 144 P.3d 983 (2006). The "mere fact" that the parties to a contract present competing interpretations of a particular provision of that agreement "does not compel a *1122 conclusion of ambiguity." Manley v. City of Coburg , 282 Or. App. 834, 839, 387 P.3d 419 (2016). Rather, a provision is ambiguous only "if it is capable of more than one sensible and reasonable interpretation." PGF Care Center, Inc. , 208 Or. App. at 151, 144 P.3d 983. By contrast, a provision is unambiguous if "its meaning is so clear as to preclude doubt by a reasonable person." Id .
To answer whether the letter agreement is ambiguous, we first consider the text of the disputed provision in the context of the agreement as a whole and in light of the *784 circumstances underlying the formation of the contract. Yogman , 325 Or. at 361, 937 P.2d 1019 (examining, as the first step of contract analysis, the text of the disputed provision in the context of the whole agreement); Batzer Construction, Inc. v. Boyer , 204 Or. App. 309, 317, 129 P.3d 773, rev. den. , 341 Or. 366, 143 P.3d 239 (2006) (examining, at the first step, circumstances underlying contract formation in addition to text and context); ORS 42.220 (allowing the court, "in construing an instrument," to consider the "circumstances under which [the contract] was made"). If, based on our review of the text, context, and underlying circumstances, we determine that there is only one plausible interpretation of the disputed provision, "then our analysis is complete and we give the appropriate effect to the parties' intentions." Industra/Matrix Joint Venture v. Pope & Talbot, Inc. , 341 Or. 321, 332, 142 P.3d 1044 (2006) (describing Yogman analysis). If, on the other hand, the disputed provision is ambiguous, we "proceed to the second of the three analytical steps" and "examine extrinsic evidence of the contracting parties' intent." Yogman , 325 Or. at 363, 937 P.2d 1019. Summary judgment is inappropriate if, at this second step, it is apparent that there is a genuine issue of fact raised about the parties' intent in the relevant extrinsic evidence. Petrillo v. PERB , 286 Or. App. 200, 206, 398 P.3d 1006, rev. den. , 362 Or. 175, 406 P.3d 608 (2017) ("Summary judgment is not appropriate unless there are no factual disputes regarding relevant extrinsic evidence."). Finally, if "the first two analytical steps have not resolved the ambiguity," we turn to the "third and final analytical step," which involves a consideration of "appropriate maxims of construction." Yogman , 325 Or. at 364, 937 P.2d 1019.
We start with the text of the provision in the context of the letter agreement as a whole. Id. at 361, 937 P.2d 1019. Section 5 of the agreement addresses SDCs and SDC credits as follows:
"(A) The parties acknowledge and agree that the SDC amounts and credits in Part 'B,' below, are best estimates based on presently available information, and that the actual amounts may differ and that the actual amounts will be determined in the normal course of building permit submittal and approval.
"(B) The parties agree that the estimated amount of $ 3,858,553 is the total amount to be paid by Alexander *785 for building permits and SDCs to develop the Apartment Project and that $ 685,493 is the total amount to be paid by BDC for the Senior Housing Project. Developer acknowledges and agrees that actual amounts may differ and will be determined in the normal course of building permit submittal and approval. The amounts owed for SDCs for the two projects will be offset by an SDC credit currently estimated based on best information but subject to further refinement at $ 1,300,000 which can be allocated between the Apartment Project and the Senior Housing Project at the Developer's discretion. * * * The actual amounts of SDC credits may differ and will be determined in the normal course of building permit submittal and approval."
The text of the disputed provision, considered in isolation, appears ambiguous. On the one hand, a reasonable juror, looking only at the provision itself, might understand the reference to SDCs being "offset by an SDC credit," without any reference to categories of SDCs or limitations, to reflect a promise by the city to allow plaintiffs to apply all SDC credits to offset all SDCs without regard to category. At the same time, however, the provision does not include an articulated promise by the city to fully reimburse plaintiffs for any and all SDC credits regardless of total like-kind SDCs. Moreover, the provision speaks entirely in generalizations and *1123 estimates, such that it is difficult, if not impossible, to find any truly promissory language in it. The provision in isolation remains ambiguous and subject to competing reasonable interpretations.
Any ambiguity in the text of the provision, however, is resolved when considered in the context of the entire agreement. First, nowhere in the letter agreement is there other language that even approaches a promise by the city to deviate from the city code in the manner suggested by plaintiffs. Second, and more significantly, section 6 of the letter agreement includes a statement that the parties "acknowledge and agree that nothing in [the] agreement is intended to prohibit, or shall prohibit, [the] city from taking any action required by state law or city code." As described, the city in this case awarded plaintiffs transportation SDC credits worth $ 1,133,643.91 and, drawing from those credits, reimbursed plaintiffs for the total transportation SDC for the development project. The city's approach was consistent *786 with, and, indeed, compelled by, the city code, under which a developer may offset an SDC using only like-kind SDC credits. Plaintiffs' position, by contrast, is that section 5 of the letter agreement amounts to a promise by the city to deviate from the city code to fully reimburse plaintiffs for all transportation SDC credits regardless of the sum total of the transportation SDCs assessed by the city. Beyond the fact that section 5 of the letter agreement does not clearly contain such a promise, plaintiffs' position is untenable in light of the city's unambiguous commitment to adhere to state law and the city code, both of which preclude the city from reimbursing plaintiffs for transportation SDC credits that cannot be matched to transportation SDCs.
The evidence in the record of the underlying circumstances of the contract formation provides additional support for that conclusion. The underlying circumstances can include the position of the parties. Batzer Construction, Inc. , 204 Or. App. at 317, 129 P.3d 773. Here, plaintiffs are land developers who presumably knew, or were on notice of, the state and local laws and regulations governing large-scale development projects like the one in this case. See Arken v. City of Portland , 351 Or. 113, 140, 263 P.3d 975, adh'd to on recons , 351 Or. 404, 268 P.3d 567 (2011) (parties are charged with notice of the law). In fact, the record includes evidence that the city pointed plaintiffs to the specific city code provisions explaining how the city calculates and reimburses developers for SDC credits, including the category-specific restrictions imposed by the city code on the credit reimbursement process. It is untenable for plaintiffs to now argue that they believed that the city had promised to reimburse them for SDC credits in a manner inconsistent with the city code despite the lack of a clear commitment by the city to do so and especially considering the city's commitment in the letter agreement itself not to deviate from the city code.
Turning to the city's position, there is nothing to suggest that the city was ever in the position to deviate from the city code provisions governing SDC credits on a case-by-case basis. Under ORS 223.304(5)(c), cities are capable of adopting SDC credit reimbursement schemes that allow for credit transfers. But, as explained, the Eugene City Code uses a category-specific reimbursement model to calculate *787 and apply SDC credits. The city code does not include any language permitting the city to make case-by-case exceptions or exemptions to reimburse a developer for all SDC credits regardless of like-kind SDCs. The city's express invocation of state law and the city code in its dealings with plaintiffs demonstrates that the city understood its obligation to adhere to the city code and was not promising to deviate from it.
The circumstances underlying the formation of a contract also include evidence pertaining to the contract's formation. Batzer Construction, Inc. , 204 Or. App. at 322, 129 P.3d 773. The city points to an email sent by the City Attorney's office to plaintiffs before the parties signed the letter agreement as relevant evidence of the letter agreement's formation. That email included the following passage:
"[T]he city manager will not sign any agreement that requires him (or staff) to violate state law or city code. The manager *1124 (and staff) have no authority to limit or otherwise specify the amount of permit fees or SDCs prior to our receipt of the plans that are actually used to determine the amount of those fees and SDCs. So if the bank wants a couple paragraphs that specify the ESTIMATED amount of fees and SDCs (and credits), that is fine, but that estimate will in no way whatsoever be binding or a factor when the actual plans are submitted and the fees and SDCs actually determined. In my view, those paragraphs[-section 5 of the letter agreement-]are worthless and should be deleted from the agreement since the paragraphs are not an agreement on anything. But if the bank wants them, we can leave them in but only with the express statements that they are estimates and that the actual amounts will be determined later."
(Capitalization in original.)
As a preliminary matter, we acknowledge, as we have before, that "the distinction between the extrinsic evidence that can properly be considered at the first, as opposed to the second, Yogman level is, as a practical matter, less than clear." Nixon v. Cascade Health Services, Inc. , 205 Or. App. 232, 241 n. 10, 134 P.3d 1027 (2006). Indeed, although ORS 42.220 limits our consideration at the first level of contract analysis to extrinsic evidence of "the circumstances *788 under which the agreement was made," our case law "offers little guidance as to what evidence so qualifies." Id . We have, however, recognized that precontractual communications between the parties to a contract as to the meaning of a particular phrase or provision may be considered among the circumstances underlying the formation of the contract. See Batzer Construction, Inc. , 204 Or. App. at 321-22, 129 P.3d 773 (treating statements made by the defendant to the plaintiffs before the parties signed the contract regarding the meaning of a term in the contract as evidence of the circumstances underlying the formation the contract); Nixon , 205 Or. App. at 241 n. 10, 134 P.3d 1027 ("[T]he content of discussions during contract negotiations appear to qualify [as evidence that can be considered at the first Yogman step]."). The city's email to plaintiffs falls into that category, and so we consider it to the extent that it provides insight into the circumstances underlying the letter agreement.
Read for that limited purpose, the email further articulates what is demonstrated by the text and context of the letter agreement itself, namely that (1) section 5 of the letter agreement entails only a nonbinding estimate of how much plaintiffs might receive from the city in SDC credits and (2) the parties understood that the city was not promising in the letter agreement to deviate from the city code with respect to the amount or method of SDC credit reimbursement. Indeed, the email put plaintiffs on notice that the city fully intended to adhere to the city code with respect to SDCs and SDC credits. In short, the email demonstrates that plaintiffs were aware before they signed the letter agreement that the city was not making any binding promises to reimburse plaintiffs for any particular amount of SDC credits, that the actual amount would be entirely dependent on calculations made by the city at a later date consistently with the city code, and that the total credits and the application of those credits would conform to the methodologies required by the city code.
With the foregoing in mind, we conclude that the trial court did not err in granting the city's motion for summary judgment on plaintiffs' breach of contract claim. In light of (1) the text of the letter agreement read in context, *789 including the agreement's unambiguous invocation of the city code and (2) the circumstances underlying the agreement's formation, including the parties' respective positions and prior communications between the parties, the letter agreement unambiguously does not constitute a binding agreement by the city to deviate from the city code to reimburse plaintiffs for SDC credits that cannot be matched to like-kind SDCs. Thus, the trial court did not err in granting summary judgment to the city on plaintiffs' breach of contract claim.
B. Second Assignment of Error-Unjust Enrichment
We turn to whether the trial court erred when it granted summary judgment *1125 in the city's favor on plaintiffs' unjust enrichment claim. Oregon courts analyze claims for unjust enrichment under the methodology established by Larisa's Home Care, LLC v. Nichols-Shields , 362 Or. 115, 131-32, 404 P.3d 912 (2017).[4] In that case, the Supreme Court directed that unjust enrichment claims should be decided on a " 'case-by-case basis.' " Hoag Living Trust v. Hoag , 292 Or. App. 34, 45, 424 P.3d 731 (2018) (quoting Larisa's Home Care, LLC , 362 Or. at 127, 404 P.3d 912 ). The court explained that "Oregon courts should examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." Larisa's Home Care, LLC , 362 Or. at 132, 404 P.3d 912.
Plaintiffs essentially argue that the parties intended for the city to reimburse all SDC credits in exchange for the *790 bridge improvements and that, as a matter of equity, the trial court should require the city to do so even if (1) the contract is unambiguous and fails to capture that intent and (2) the city code prohibits the city from doing so. But, on appeal, plaintiffs have not identified any Oregon case or other legal authority that has classified that circumstance as an established category of unjust enrichment, and we are aware of none. For example, even if we assume that plaintiffs genuinely believed that they would be reimbursed for all SDC credits, nothing in the record suggests that that mistake was the result of fraud or misrepresentation by the city. Cf. id. at 133, 404 P.3d 912 ("At least one of plaintiff's allegations in this action falls squarely within the categories recognized by Oregon case law and treatises to involve unjust enrichment: plaintiff alleges that [defendant's estate] has been benefited by fraud." (Citing Restatement (Third) of Restitution & Unjust Enrichment § 13 comment a (2010).)).
As discussed, plaintiffs had notice of the city code provisions governing SDCs and SDC credits, and the relevant provisions of the letter agreement do not amount to a promise by the city to deviate from its code in any respect. Based on the summary judgment record, it is apparent that the city followed the city code in its dealings with plaintiffs and repeatedly informed plaintiffs that it would adhere to the code. The consequences flowing from the city's strict adherence to the code is not a basis for unjust enrichment. Thus, the trial court did not err when it granted summary judgment to the city on plaintiffs' unjust enrichment claim.
Affirmed on appeal; cross-appeal dismissed as moot.

The city also brings what it captions as a cross-appeal, in which it assigns error to the trial court's denial of an earlier motion for summary judgment on the basis of claim preclusion. We do not address that assignment of error in light of our disposition.

ORS 223.304(5)(a) provides, in relevant part, that "[t]he credit provided for in subsection (4) of this section is only for the improvement fee charged for the type of improvement being constructed."

ORS 223.304(5)(c) provides:
"When the construction of a qualified public improvement gives rise to a credit amount greater than the improvement fee that would otherwise be levied against the project receiving development approval, the excess credit may be applied against improvement fees that accrue in subsequent phases of the original development project. This subsection does not prohibit a local government from providing a greater credit, or from establishing a system providing for the transferability of credits, or from providing a credit for a capital improvement not identified in the plan and list adopted pursuant to ORS 223.309, or from providing a share of the cost of such improvement by other means, if a local government so chooses."

At the time of the summary judgment ruling in this case, our courts analyzed claims for unjust enrichment based on the elements in Jaqua v. Nike, Inc. , 125 Or. App. 294, 298, 865 P.2d 442 (1993). In Jaqua , we described those elements as (1) a benefit conferred, (2) awareness by the recipient that it has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring the recipient to pay for the benefit. The trial court relied on Jaqua when it granted the city's motion. After entry of the judgment in the city's favor, in Larisa's Home Care, LLC , 362 Or. at 131, 404 P.3d 912, the Supreme Court rejected the Jaqua test because it concluded that the test was too vague and under-inclusive of the circumstances in which a plaintiff could establish unjust enrichment. The court then set out a new test to be used by Oregon courts. We rely on the Larisa's Home Care, LLC , test to resolve this appeal because, as a general rule, we determine if a trial court erred based on the law existing at the time of appeal and not as of the time that the trial court made its ruling. See State v. Jury , 185 Or. App. 132, 136, 57 P.3d 970 (2002) ("Error, in general, must be determined by the law existing at the time the appeal is decided, and not as of the time of trial.").