Argued and submitted January 9, reversed and remanded September 27, 2006

PGF CARE CENTER, INC.,
an Oregon corporation,
*Appellant,*

*v.*

H.L. WOLFE
and E.J. Wolfe,
Trustees under the Wolfe Living Trust
dated July 22, 1992,
*Respondents.*

H.L. WOLFE
and E.J. Wolfe,
Trustees under the Wolfe Living Trust
dated July 22, 1992,
*Third-Party Plaintiffs,*

*v.*

Phillip G. FOGG, Jr.,
and Angela J. Fogg,
husband and wife,
*Third-Party Defendants.*

0401-00608; A127626

144 P3d 983

Kevin H. Kono argued the cause for appellant. With him on the brief were Timothy R. Volpert, Rodney E. Lewis, Jr., and Davis Wright Tremaine LLP. On the reply brief was Kent B. Thurber.

Robert J. Miller, Sr., argued the cause for respondents. With him on the brief were Brien F. Hildebrand and Moomaw, Miller & Hildebrand, LLP.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Schuman, Judge.

LANDAU, P. J.

## LANDAU, P. J.

At issue in this case is the extent to which a lease-option agreement that calls for a valuation of the premises binds the parties to the value that an appraiser produced. Specifically, the parties dispute whether the contractual definition of the "property" to be appraised precludes the appraiser from considering in the valuation the fact that the property currently houses an ongoing business. Both plaintiff, the lessee, and defendants, the lessors, filed claims for specific performance, based on their respective views about the proper valuation of the premises. The trial court entered summary judgment for defendants, concluding that, as a matter of law, the lease-option agreement permits the appraiser to include the disputed component of value. Plaintiff appeals, arguing that, as a matter of law, the lease-option agreement precludes consideration of the fact that there is an ongoing business on the premises. In the alternative, plaintiff argues that the lease-option agreement is at least ambiguous on the point. We agree with plaintiff that the agreement is ambiguous and therefore reverse and remand.

The relevant facts are not in dispute. In 1994, plaintiff entered into a 10-year lease-option agreement with defendants. Under the terms of that agreement, plaintiff agreed to lease from defendants the Columbia Manor Nursing Home, a long-term care facility in Portland. The agreement includes an option to purchase the facility. It provides that, if plaintiff decides to exercise its purchase option, the parties will attempt to agree on a purchase price, but, if unable to do so, they will hire an appraiser to determine the fair market value of "the Property." The agreement provides that the sale price then consists of that value less $100,000. The agreement specifically defines "the Property" as "the Land and the Building and the Personal Property, collectively." The constituent parts of "the Property" are also expressly defined in the lease, as follows:

> " 'Building' shall mean that certain building referred to as Columbia Manor Nursing Home * * * together with all improvements to and additions now or hereafter erected[.]

> "* * * * *

" 'Land' shall mean that certain parcel of land, in the city of Portland, county of Multnomah, and state of Oregon as more fully described in [an attached exhibit.]

"\* \* \* \* \*

" 'Personal Property' shall mean all property used and useful in the operation of the Columbia Manor Nursing Home and located on or about the Building[.]"

Plaintiff leased the property and operated a nursing home business there for several years. In 2003, plaintiff elected to exercise its purchase option. The parties were not able to agree upon a price, however. Among other things, they disputed the relevance of any going concern value and its impact on the fair market value of "the Property." Pursuant to their agreement, they hired an appraiser.

The parties instructed the appraiser to appraise the nursing home property in accordance with the terms of the lease agreement. Soon thereafter, the appraiser returned an appraisal. The appraisal explained that the most accurate valuation method for appraising a nursing home is one that is based on the property's future income potential. Applying that approach, the appraisal concluded that the "market value of the fee simple interest in the appraised property" is $2.9 million. The appraisal explained that, under that approach, fair market value is "segregated into the components that make up value. This includes tangible real estate as if vacant (land and buildings), realty related stabilized operations (stabilized occupancy and in-place trained staffing), and personal property (moveable furnishings, fixtures, and equipment). Business value is excluded." The appraisal then allocated the value to each of those components as follows: $2,242,000 to tangible real estate; $506,000 to realty related stabilized operations; and $152,000 to personal property.

A dispute quickly arose between the parties as to whether the fair market value of the property included the $506,000 attributed to "realty related stabilized operations." Defendants maintained that the property's fair market value includes, by definition, *any* factors that the appraiser determined would affect its price on the open market and, as a result, the appraised fair market value of the property under

the agreement was the entire $2.9 million. Plaintiff argued that the agreement limited the definition of "the Property" to a particular piece of land, a particular building, and particular pieces of personal property and that, as a result, the appraisal was required to be limited to what plaintiff describes as simply the "bricks, mortar, dirt and personal property," without reference to any other things, including plaintiff's business, on the site. As a result, plaintiff insisted that the fair market value was only $2.4 million.

At an impasse, the parties resorted to the courts. Plaintiff filed a claim for specific performance, asking for an order requiring defendants to sell the property for $2.3 million, that is, a "proper" valuation of the premises at $2.4 million, less the agreed-to $100,000. Defendants counterclaimed for specific performance, asking for an order requiring plaintiff to buy the property for $2.9 million.

■ Both parties moved for summary judgment, each arguing that the lease-option agreement unambiguously either precluded or required consideration of the $506,000 in realty related stabilized operations component of the appraisal. The trial court granted defendants' motion, denied plaintiff's motion, and entered judgment accordingly. The court reasoned that the $506,000 is a part of the appraisal, and that ends the matter. According to the trial court,

"[t]his adjustment may be ill-advised. Other appraisers might have omitted it, although nothing in this record supports that conclusion. But, no matter. Even if the appraisal were mistaken, it is beyond the power of this court to correct. The parties agreed to submit the valuation to an appraiser, and to this appraiser in particular. That agreement, like an agreement to arbitrate, is binding on the parties. Absent fraud or misconduct, which has not been alleged, let alone proved, the appraisal cannot be disturbed, even if wrong."

On appeal, plaintiff argues that the trial court erred in granting defendants' motion and in denying its own motion for summary judgment. It essentially renews its argument that the lease-option agreement provision that expressly defines "the Property" that is subject to the appraisal limits the scope of the appraisal to the land, the

building, and the relevant personal property, as a matter of law. In the alternative, plaintiff argues that, at the very least, the lease-option agreement is ambiguous on the point, and that the trial court erred in granting summary judgment on the ground that the agreement is unambiguous as a matter of law. Defendants also renew their arguments that, under the unambiguous terms of the lease-option agreement, plaintiff is bound by the full assessed value, including the value of realty related stabilized operations.

When there are cross-motions for summary judgment, and the assignment of error on appeal targets both the granting of one and the denial of the other, both are subject to review. *Farmers Ins. Exchange v. Crutchfield,* 200 Or App 146, 152-53, 113 P3d 972, *rev den,* 339 Or 609 (2005). In both instances, we examine the evidence in the light most favorable to the nonmoving party to determine whether there are genuine issues of material fact and whether the moving party was entitled to judgment as a matter of law. ORCP 47 C.

Disputes over the meaning of a contract provision may not be disposed of by summary judgment if the provision is ambiguous. *Western Surety Co. v. FDS Diving Construction,* 193 Or App 1, 6, 88 P3d 293 (2004). A contract provision is ambiguous if it is capable of more than one "sensible and reasonable interpretation." *Deerfield Commodities v. Nerco, Inc.,* 72 Or App 305, 317, 696 P2d 1096, *rev den,* 299 Or 314 (1985). Conversely, it is unambiguous only if "its meaning is so clear as to preclude doubt by a reasonable person." *Id.* Whether the terms of a contract are ambiguous is a question of law, *Yogman v. Parrott,* 325 Or 358, 361, 937 P2d 1019 (1997), which we answer by considering the text of the provision in the context of the agreement as a whole and in light of the circumstances underlying the formation of the contract. *Batzer Construction, Inc. v. Boyer,* 204 Or App 309, 317, 129 P3d 773, *rev den,* 341 Or 366 (2006).

At the outset, we pause to address a preliminary issue, namely, whether the trial court was correct in asserting that the dispositive issue is not—as the parties frame it at trial and on appeal—one of contract construction at all. The trial court reasoned that, because the parties had authorized the appraisal, they effectively agreed to be bound by it,

whether correctly performed or not, as long as there was no evidence of fraud or misconduct.

The trial court's comments in that regard recall the Supreme Court's decision in *Valenti v. Hopkins*, 324 Or 324, 926 P2d 813 (1996). In that case, the plaintiffs brought an action against a neighbor who proposed to build a house that would obstruct the plaintiffs' view in violation of certain restrictive covenants. The trial court denied relief on the ground that the restrictive covenants authorized a private architectural review committee to determine whether construction within the subdivision conformed to various restrictions. The court affirmed the trial court's decision on the ground that, when a contract unambiguously authorizes certain disputes to be resolved by third parties, decisions of those third parties will not be disturbed in the absence of "fraud, bad faith, or a failure to exercise honest judgment." *Id.* at 335.

In this case, however, the question is whether the lease-option agreement unambiguously described the scope of the matter that is subject to appraisal in the first place. That question, as the court confirmed in *Valenti*, is one of contract construction, subject to the ordinary rules of contract construction. *Id.* at 331-32. We turn, then, to the question whether the lease-option agreement in this case unambiguously describes the nature of "the Property" that is supposed to be the subject of the appraisal.

As we have noted, the agreement requires an appraiser to assess the fair market value of "the Property," which is specifically defined as consisting of three components: the building, the land, and personal property located in or about the building. Strictly speaking, the agreement does not define "the Property" to include considerations of the effect of a stable, ongoing business operation on any of those three components. Reading the agreement to require an appraisal of the "bricks, mortar, dirt and personal property" to which plaintiff refers certainly does no violence to the wording of the lease-option agreement and is consistent with that wording in every respect. Plaintiff's reading of the agreement, in other words, is at least a reasonable one.

The question remains, however, whether it is *the only* reasonable construction of the wording of the lease-option agreement. Returning to that wording, we note that the agreement requires an appraiser to assess "fair market value" of the property. As the phrase is ordinarily used, "fair market value" or "market value" refers to the "price at which both buyers and sellers are willing to do business : the market or current price." *Webster's Third New Int'l Dictionary* 1383 (unabridged ed 2002). Similarly, in a legal context, "fair market value" refers to "[t]he amount at which property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Black's Law Dictionary* 537 (5th ed 1979); *see also* ORS 308.205 (defining "real market value" as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction").

Given those ordinary definitions, a reasonable and sensible interpretation of "fair market value" of the property at issue in this case is the amount that a willing buyer with knowledge of the relevant facts would pay for the property's components, *i.e.*, the land, building, and personal property. The appraiser apparently determined that the presence of plaintiff's business was precisely the sort of "relevant fact" that would affect the amount—to the tune of more than half a million dollars—at which those components would likely change hands between a willing buyer and seller. Considering that fact as part of the "fair market value" strikes us as entirely consistent with the wording of the agreement.

Plaintiff insists that it "makes no sense" for the appraiser to consider the impact of plaintiff's own ongoing business, in effect, penalizing plaintiff for the fact that it happens to be the one that owns the business:

"[I]t makes perfect sense that the Lease would provide for valuation and sale of only the Land, Building, and Personal Property and not any [Realty Related Stabilized Operation] value because plaintiff already owned that interest. If a third party were to purchase the subject real estate, improvements, and business, 'going concern' value would naturally comprise part of the value of that purchase. Here,

however, it is plaintiff's own business that provides any enhanced 'going concern' or 'realty related stabilized operation' value."

The problem with the argument is that it appears to be based on a misapprehension of what the appraiser in this case meant by "realty related stabilized operations." Contrary to plaintiff's assertions, the appraiser expressly stated that "realty related stabilized operations" does *not* refer to a valuation of plaintiff's business itself. It is instead the extent to which the fact that *any* stable, ongoing business currently exists on the property affects its value. The appraiser, in other words, concluded that a piece of property on which there is a stable, currently operating business is worth more than the same piece of property lying vacant. We find nothing in the phrasing of the lease-option agreement that affirmatively and unambiguously precludes the appraiser from taking that consideration into account in conducting the appraisal.

In consequence, we confront two competing constructions of the same contractual phrasing. Each is at least consistent with the wording of the agreement. Neither is "so clear as to preclude doubt by a reasonable person." *Deerfield Commodities*, 72 Or App at 317. We conclude that the lease-option agreement is ambiguous as to the requirement that the parties obtain an appraisal of the "fair market value" of "the Property" at issue. Accordingly, the trial court erred in granting defendants' summary judgment motion. It did not, however, err in denying plaintiff's motion.

Reversed and remanded.