Argued and submitted June 15, 2020; reversed and remanded for entry of limited judgment for landlord on declaratory judgment claim July 21, 2021

CRYO-TECH, INC.,
an Oregon corporation,
*Plaintiff-Respondent,*

*v.*

JKC BEND, LLC,
an Oregon limited liability company,
*Defendant-Appellant.*

JKC BEND, LLC,
an Oregon limited liability company,
*Third Party Plaintiff,*

*v.*

DOUBLE R. BUILDERS CORPORATION,
an Oregon corporation,
*Third Party Defendant.*

DOUBLE R. BUILDERS CORPORATION,
an Oregon corporation,
*Fourth Party Plaintiff,*

*v.*

ALL AMERICAN FIRE PROTECTION, INC.,
an Oregon corporation; et al.,
*Fourth Party Defendants.*

Deschutes County Circuit Court
16CV08104; A169715

495 P3d 699

In this action on a "build to suit" commercial lease agreement, defendant JKC Bend, LLC (landlord), the owner and lessor of the leased premises, appeals a limited judgment for plaintiff Cryo-Tech, Inc. (tenant), the tenant of the leased premises, under ORCP 67 B, on a declaratory judgment claim in which the trial court declared that, under the terms of the parties' lease, landlord was required to deliver to tenant "Landlord Improvements" that were free of construction defects and in accordance with a construction contract referred to in the lease. The issue on appeal concerns a construction of the parties' lease and whether it allocates responsibility for the repair of latent construction defects to landlord. *Held*: On review of the trial court's ruling for legal error, the Court of Appeals concluded that the parties' lease does not require landlord to cover the costs to repair construction defects and that the trial court therefore erred in granting tenant's motion for summary judgment and denying landlord's motion.

Reversed and remanded for entry of limited judgment for landlord on declaratory judgment claim.


Walter Randolph Miller, Jr., Judge.

Rohn M. Roberts argued the cause for appellant. Also on the briefs were John R. Roberts and Arnold Gallagher P.C.

Megan K. Burgess, argued the cause for respondent. Also on the brief was Peterkin Burgess.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

ARMSTRONG, P. J.

Aoyagi, J., concurring in part and dissenting in part.

Reversed and remanded for entry of limited judgment for landlord on declaratory judgment claim.

**ARMSTRONG, P. J.**

In this action on a "build to suit" commercial lease agreement, defendant JKC Bend, LLC (landlord), the owner and lessor of the leased premises, appeals a limited judgment for plaintiff Cryo-Tech, Inc. (tenant), the tenant of the leased premises, under ORCP 67 B, on a declaratory judgment claim in which the trial court declared that, under the terms of the parties' lease, landlord was required to deliver to tenant "Landlord Improvements" that were free of construction defects and in accordance with a construction contract referred to in the lease. The issue on appeal concerns a construction of the parties' lease and whether it allocates responsibility for the repair of latent construction defects to landlord. We review for legal error the trial court's determination that the lease allocates that risk to landlord. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997); *Adair Homes, Inc. v. Dunn Carney*, 262 Or App 273, 277, 325 P3d 49, *rev den*, 355 Or 879 (2014). For the reasons explained below, we conclude that the lease does not require landlord to cover the costs to repair construction defects and that the trial court therefore erred in granting tenant's motion for summary judgment and denying landlord's motion.

Tenant, the owner of a Dairy Queen franchise in Redmond, Oregon, was seeking to relocate its store. It identified a former bank building as a suitable structure and location for conversion to a Dairy Queen Grill & Chill restaurant. Tenant approached landlord, seeking a "build to suit" lease, under which landlord would purchase the property, enter into a construction contract with a builder chosen by tenant, finance a reconstruction of the premises to a Dairy Queen restaurant, and lease the reconstructed premises to tenant. Landlord agreed.

The parties then negotiated a lease and agreed that, contingent on landlord's purchase of the property and execution of a construction contract that met with tenant's approval, the reconstructed property would be leased to tenant for an initial term of 20 years, at an initial rental rate calculated by amortizing the costs of acquiring and converting the property over the 20-year lease term, using an eight percent per annum rate of return. The parties executed the

lease agreement before landlord's purchase of the property closed and before landlord had entered into a construction contract with a builder. The lease was contingent on landlord closing on the purchase of the property by a certain date. Section 2.2 of the lease provides that tenant's obligation to lease the property is contingent on landlord "entering into a Construction Contract for the construction of the Landlord Improvements on terms and conditions reasonably approved by [tenant]."

Although the contract for construction was to be between the builder and landlord, tenant was involved in the development of the plans, the selection of the contractor, and the negotiation of the construction contract. Tenant had previously selected an architect.

Section 3 of the lease describes "Landlord Improvements"[1]—the improvements to be made to the premises to convert it to a Dairy Queen store:

"3   Landlord Improvements:   Tenant has contracted with the architecture firm of Tekneek Architecture P.C. (Larry Wright) (the "Architect") to prepare plans and specifications for certain improvements to the Premises ('Landlord Improvements') in order to convert the Premises to Tenant's intended use ('Plans and Specifications'). Within ten (10) days of receipt of the Plans and Specifications, Tenant shall provide Landlord with its notice of approval of the Plans and Specification or its written objection to any items contained in the Plans and Specifications ('Tenant Rejection'). If Tenant provides a Tenant Rejection it shall send the written rejection to Landlord and Architect. If Tenant approves of the Plans and Specifications it shall provide notice of approval to Landlord and Landlord shall provide written notice within five (5) days of either[:] (i) approval of the Plans and Specifications, or (ii) detailed description of any provision(s) Landlord does not approve. Landlord may only reasonably object to the Plans and Specifications for reasons related to the security of Landlord's interest in the Premises, Tenant's compliance with the terms of this Lease, and/or, based on the Construction Costs, the

---

[1] The lease distinguishes Landlord Improvements from "Tenant Improvements," which were tenant's installation of fixtures and equipment for the Dairy Queen operations.

Landlord Costs, as defined in section 7.1 are reasonably determined to be in excess of $1,650,000."[2]

The lease required tenant's approval of the selection of a contractor and negotiation of the construction contract:

"3.2   Tenant and Landlord shall negotiate with a licensed and bonded contractor a written construction agreement for the construction of the Landlord Improvements (the 'Construction Agreement'). The Construction Agreement will be entered into by Landlord and must be approved by Tenant in Tenant's reasonable discretion subject to the budget and business constraints of Tenant (as determined in Tenant's reasonable discretion). The Construction Agreement shall provide, among other terms reasonably requested by Tenant, that no change orders may be made without Tenant's written approval. Tenant shall obtain builder's risk insurance during the term of the construction of the Landlord Improvements and name Landlord as an additional insured."

The lease required landlord to pay all the costs of constructing the Landlord Improvements:

"3.1   All costs incurred for the Landlord Improvements including without limitation the conversion and reconstruction including design work, permit applications, inspection fees, materials and labor, Plans and Specifications ('Construction Costs') shall be paid by Landlord[.]"

Tenant's obligation to begin paying rent on the lease began on the "Rent Commencement Date," defined in Section 6 as

"the earlier of: (i) the date Tenant opens for business on the Premises; or (ii) fifteen (15) days after completion of the Landlord Improvements, and the issuance of all required final approvals/certificates of occupancy from applicable governmental agencies."

_____

[2] A proposed draft of Section 3 included the statement:

"Landlord, upon receipt and approval of such plans, specifications and construction agreements, agrees to complete necessary conversion and reconstruction of the building and other improvements on the Real Property to a Dairy Queen Restaurant according to the plans specifications and construction agreements."

Section 7 of the lease described the calculation of tenant's "monthly base rent":

> "[U]pon completion of the Landlord Improvements, the parties shall calculate the initial Base Rent to be paid by Tenant to Landlord pursuant to Section 8 herein below, to be based upon providing to Landlord an eight percent (8%) per annum return on its total investment in the real property from the date of purchase to the Rent Commencement Date (Landlord Costs)."

Thus, the rent to be paid under the lease was to be based on an eight percent return on landlord's total investment—landlord's "Landlord Costs." The lease described Landlord Costs as the sum of the purchase price, closing costs, "all construction costs," and "all costs other than attorney fees incurred by Landlord directly related to its ownership of the Real Property between the date of purchase and the Rent Commencement Date." The lease then provided a sample calculation of the monthly Base Rent as one-twelfth of the sum of landlord's "Landlord Costs."

After the execution of the lease, landlord entered into a contract with a builder chosen by tenant, third-party landlord Double R Builders Corporation (Double R), for the construction of the improvements.[3] Tenant was not a signatory to the construction contract, but the construction contract listed tenant and one of tenant's owners as landlord's "authorized agents." The construction contract included a warranty to landlord, the "owner":

> "The Contractor warrants to the Owner and Architect that * * * the Work will be free from defects not inherent in the quality required or permitted; and * * * the Work will conform to the requirements of the Contract Document."

As noted, the construction contract itself was executed after the lease.

Under the terms of the lease, tenant took possession of the premises after landlord's purchase.[4] Double R

---

[3] The initial construction contract was with a builder of tenant's choosing whom, on tenant's request, defendant fired. Tenant then chose and defendant contracted with Double R.

[4] Although tenant took possession of the premises when defendant's purchase of the property closed, tenant's obligation to pay rent did not begin until construction was completed.

undertook to construct the improvements. Tenant's owner reviewed and approved Double R's invoices, including the invoice for the final payment, and delivered the invoices to landlord for payment. When the project was complete, tenant delivered the final invoice to landlord, and, on tenant's request, landlord made the final payment for construction. On the issuance of a certificate of occupancy, tenant began to pay rent and to operate its business on the premises, and it has continued to do so.

Tenant alleges that shortly after occupancy, tenant discovered latent defects in the Landlord Improvements. Tenant sought landlord's help to remedy the defects, but landlord declined, contending that the lease made no warranties as to the Landlord Improvements and that landlord had no obligation under the lease to assist with repairs. Tenant brought this action against landlord, alleging claims for breach of contract and unjust enrichment. Tenant also sought a declaration that the lease required landlord to deliver to tenant premises that were free of construction defects and that complied with the plans and specifications of the construction contract, a declaration that tenant has no obligation under the lease to repair construction defects, and a further declaration that "Landlord has an obligation to cause repairs to the Landlord Improvements to correct construction defects."

The lease included a provision for attorney fees to the prevailing party "[i]n the event that suit or action is instituted by either Party hereto *** for any breach of this Lease or for interpretation of any of the terms or conditions hereof." Tenant also sought an award of attorney fees.

The court bifurcated the case and first considered the declaratory judgment claim, which addressed the construction of the lease. After discovery, tenant filed a motion for partial summary judgment, seeking a declaration that "Tenant has no obligation to cause repairs to Landlord Improvements that were defective at initial construction and that Landlord is obligated to cause repairs to the Landlord Improvements to correct construction defects." Landlord filed a cross-motion for partial summary judgment, seeking a declaration that landlord had "no obligation under

the lease for defects in the construction of the Landlord Improvements, if any." Thus, each party contended that the other had responsibility to make repairs to the Dairy Queen store to remedy the contractor's defective construction of the Landlord Improvements.

Under the common law, absent a "special agreement," a commercial landlord has no duty to make repairs to leased premises. *McWilliam v. Phillips Petroleum, Inc.*, 269 Or 526, 528, 525 P2d 1011 (1974); *Propp v. Long*, 129 Or App 273, 280, 879 P2d 187, *rev den*, 320 Or 271 (1994) (emphasis in original) ("In the absence of an agreement to the contrary, under the common law a landlord generally is not responsible for repairing conditions that develop or are created after possession has been transferred to the tenant."). Thus, the question for the trial court on the parties' motions for summary judgment was whether, under the lease, landlord was assigned responsibility for the repair of defective construction.

In asserting that it had no liability for defective construction under the lease, landlord first pointed out that there is no provision in the lease either warranting the condition of the improvements or assigning responsibility for their repair. Landlord noted that Section 18 of the lease, "Damage or Destruction," sets out the landlord's repair obligations with respect to "damage" and imposes an obligation on landlord only to make repairs covered by insurance and makes no reference to a duty to repair defective construction or to repair damage caused by defective construction.[5]

Landlord noted that, under Section 17 of the lease, describing "Repairs, Care of Premises and Alterations," any repairs to the premises after the initial construction of the Landlord Improvements (with the exception of those

---

[5] Section 18 of the lease provides, in part:

"If Premises is damaged and the nature and extent of the damages or cause thereof is covered under the insurance policies then in effect, Landlord, with reasonable diligence, shall repair the damage if the repairs can be made under applicable laws and regulations.

"* * * [I]f the Premises is damaged in a manner not covered by the insurance policies then in effect, or to an extent beyond the coverage limits of said policies, Landlord, at Landlord's election, may either repair the damage or terminate this lease."

necessitated by landlord's negligence or willful act) were tenant's responsibility. Section 17 provides:

> "Except as set forth in Section 18 and except regarding the initial construction of the Landlord Improvements, Landlord shall be under no obligation to rebuild, replace, or make repairs of any nature, structural or otherwise, to the Premises or any improvements located thereon during the term of this Lease or any renewal or extension hereof. Tenant shall, at all times, take good care of the Premises and any improvements placed thereon, and shall, at its sole cost and expense, make all repairs and replacements required due to use, normal deterioration and obsolescence.

> "17.1    Tenant shall be responsible for all maintenance, repairs and replacements to the Premise, including, but not limited to, parking lot maintenance (including sealing, striping and other repairs), landscaping, painting (exterior and interior), doors, windows, all interior and exterior maintenance repairs and replacements, including electrical, plumbing, flooring, the HVAC system and repairs and replacements to the roof, walls, and foundation. Tenant agrees to maintain the Premises in good operating condition at all times.

> "17.2    Notwithstanding anything to the contrary, in the event any of such maintenance, repairs or replacements are required as the result of the negligence or willful act of the Landlord, then Landlord shall be responsible for such maintenance, repairs or replacements."

As construed by landlord, its only obligation under Section 17 is to complete the initial construction of the Landlord Improvements, and the initial construction was complete with the certificate of occupancy. Then, in landlord's view, Section 17 places responsibility for any and all repairs on tenant, except those necessitated by landlord's negligence or willful act.

In addition to the absence of an explicit provision requiring landlord to make repairs, landlord notes that the lease also does not include any warranty by landlord. In fact, Section 37 of the lease, disclaims warranties:

> "The Tenant acknowledges that this Lease is accepted and executed on the basis of Tenant's own examination and condition of the Premises; that no representations as to the

value, condition or repair of the Premises has been made by Landlord or Landlord's agent, and that Tenant takes the provisions AS IS, without warranty, express or implied, except as specifically set forth in this agreement."

That provision, landlord contended, relieves landlord of any liability for or any obligation to repair defects in the construction.

Tenant's position on summary judgment was that the lease provisions described above do not place *on tenant* responsibility for the repairs. But tenant did not contend that any particular provision of the lease explicitly places responsibility *on landlord* for repair of construction defects. Rather, tenant focused on landlord's general obligation under the lease to make the Landlord Improvements, including its obligation to contract with the contractor. In view of those requirements, tenant asserted that the benefit of tenant's bargain would be defeated if, "as a non-contracting party for the 'Landlord Improvements,' all responsibility for construction defects and necessary repairs regarding the initial construction of Landlord Improvements shifted to [tenant]." Because of its obligation to provide the Landlord Improvements, tenant contended, landlord was also responsible to see that they were defect free.

The trial court agreed with tenant, concluding that the lease unambiguously placed the risk of construction defects on landlord:

"Landlord was required under the lease agreement to deliver the landlord improvements that were free of construction defects and in accordance with the construction contract identified in that lease."

The court further concluded that tenant had "no obligation under the lease \*\*\* to cause repairs to landlord improvements that were defective at initial construction." The upshot of the trial court's ruling was that, under the lease, landlord is responsible for the repair of construction defects in the Landlord Improvements. The court granted tenant's motion for summary judgment, denied landlord's motion, and entered a limited judgment for tenant under ORCP 67 B on the declaratory judgment claim. The court also awarded tenant attorney fees.

On appeal, landlord assigns error to the trial court's granting of tenant's summary judgment motion and to the denial of landlord's own summary judgment motion. Although the denial of a motion for summary judgment is not generally reviewable, in an appeal from a final judgment entered after the granting of summary judgment, we will review the trial court's denial of a cross-motion for summary judgment. *To v. State Farm Mutual Ins.*, 319 Or 93, 873 P2d 1072 (1994). In reviewing the trial court's ruling on cross-motions for summary judgment, we view the record in the light most favorable to the party opposing it, *Eden Gate, Inc. v. D&L Excavating Trucking, Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002), to determine whether there are any disputed issues of material fact and whether either party was entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 407, 939 P2d 608 (1997).

The issue on appeal of the trial court's ruling on summary judgment concerns a construction of the parties' lease. In construing a contract, a court first examines the text of the disputed provision in the context of the contract as a whole; if the provision is unambiguous, the court construes it as a matter of law, and the analysis ends. *Yogman*, 325 Or at 361. A party is entitled to summary judgment on a contract dispute only if the governing provisions are unambiguous. *Milne v. Milne Construction*, 207 Or App 382, 142 P3d 475, *rev den*, 342 Or 253 (2006). Whether a contract is ambiguous is a legal question. *Yogman*, 325 Or at 361. A contract provision is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is capable of more than one plausible and reasonable construction. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 313, 129 P3d 773, *rev den*, 341 Or 366 (2006).

If the contract is ambiguous and there is relevant competing extrinsic evidence to resolve the ambiguity, determining the contract's meaning is a question of fact, and the dispute is not subject to summary judgment. *Abercrombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994). "[I]t is the existence of competing extrinsic evidence—and the triable factual issue that the evidence creates—that, as a general rule, makes the resolution of the meaning of an

ambiguous contract on summary judgment inappropriate[.]" *Dial Temporary Help Service v. DLF Int'l Seeds*, 255 Or App 609, 612, 298 P3d 1234 (2013). If there is no competing extrinsic evidence or if extrinsic evidence does not resolve the ambiguity, we apply established maxims of construction to determine the meaning of the disputed provisions. *Yogman*, 325 Or at 364. The parties in this case do not contend that any ambiguity in the lease can be resolved through extrinsic evidence.

The threshold for ambiguity is not high. *Central Oregon Independent Health Serv. v. OMAP*, 211 Or App 520, 529, 156 P3d 97, *rev den*, 343 Or 159 (2007) (a contract term is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is susceptible to more than one plausible construction); *see also PGF Care Center, Inc. v. Wolfe*, 208 Or App 145, 151, 144 P3d 983 (2006) (a contract provision "is unambiguous only if its meaning is so clear as to preclude doubt by a reasonable person" (internal quotation marks omitted)). To determine whether a contract is ambiguous, we examine the text of the disputed provisions in the context of the document as a whole. *Yogman*, 325 Or at 361.

In construing the parties' lease, we attempt to ascertain the intent of the parties, in light of the circumstances that existed when the agreement was reached. *Yogman*, 325 Or at 361-63. Oregon subscribes to the objective theory of contracts. That means that the lease's meaning is determined based on the parties' objective manifestations of intent to agree to the same express terms. *Dalton v. Robert Jahn Corp.*, 209 Or App 120, 132, 146 P3d 399 (2006), *rev den*, 342 Or 416 (2007). As previously noted, under the common law, absent "special agreement," a commercial landlord has no duty to make repairs to leased premises. *McWilliam*, 269 Or at 528. Thus, landlord is responsible for repairs of construction defects only if the lease assigns responsibility to landlord to make the repairs or otherwise warrants the construction. The trial court's declaratory ruling—that tenant was entitled to Landlord Improvements that were defect free—effectively determined that landlord has that obligation. Landlord's argument on appeal is that the lease agreement does not impose

on landlord any obligation to make repairs to the Landlord Improvements and includes no warranties as to construction from which an obligation to make repairs could be derived.

Tenant responds, in essence, that a warranty or obligation to repair can be inferred from landlord's general obligation to provide the Landlord Improvements. Tenant notes that tenant's obligation was contingent on landlord "entering into a Construction Contract for the construction of the Landlord Improvements on terms and conditions reasonably approved by [tenant]." In tenant's view, that requirement implicitly incorporates the contractor's promise that "the Work will be free from defects not inherent in the quality required or permitted; and *** the Work will conform to the requirements of the Contract Document." Tenant further asserts that, as the signatory to the construction contract, landlord is responsible for remedying the defective workmanship of the contractor and that the trial court therefore did not err in determining that the lease unambiguously entitled tenant to landlord improvements that were free of construction defects.

We address first the issue of warranties. As noted, the construction contract includes a warranty to landlord, the "owner," that "the Work will be free from defects not inherent in the quality required or permitted; and *** the Work will conform to the requirements of the Contract Document." But the contractor was not a party to the lease and, although the requirement for a construction contract is stated in the lease, contrary to tenant's contention, the lease does not incorporate the construction contract or the construction contract's warranties.

Additionally, the lease itself includes no warranties to tenant. Indeed, Section 37 of the lease disclaims warranties. It states:

"The Tenant acknowledges that this Lease is accepted and executed on the basis of Tenant's own examination and personal knowledge of the value and condition of the Premises; that no representations as to the value, condition or repair of the Premises has been made by Landlord ***,

and that Tenant takes the provisions[6] AS IS, without warranty, express or implied, except as specifically set forth in this agreement."

Tenant asserts that Section 37 relates only to the condition of the premises at the time tenant took possession—before construction. However, Section 37 does not limit its application to the condition of the building before construction. Additionally, the lease defines the "Premises" as the property to be leased and includes references throughout to the leased "Premises" after construction. We interpret the disclaimer of warranties to encompass the premises after the construction. But, as noted above, even assuming that the *disclaimer* of Section 37 does not encompass the new construction, there are no warranties to tenant in the lease. In contrast, the lease permitted tenant to make modifications and additions to the premises but explicitly included a warranty to landlord that those changes be "done in good and workmanlike manner," showing that the parties knew how to include a warranty if they chose to.

There are several provisions in the lease that describe repair obligations. Section 18 describes the landlord's limited repair obligation in the event of "damage" to the premises covered by insurance. It makes no mention of repair specifically with respect to damage caused by defective construction.[7]

Section 17 also addresses repairs, and its first sentence is the primary focus of our analysis. The first sentence of Section 17 addresses the landlord's obligation to make repairs:

"Except as set forth in Section 18 and except regarding the initial construction of the Landlord Improvements, Landlord shall be under no obligation to rebuild, replace, or make repairs of any nature, structural or otherwise, to the Premises or any improvements located thereon

---

[6] Landlord understands the "provisions" to refer to the provided Landlord Improvements. We think it more likely that "provisions" was a typographical error that was supposed to be "Premises."

[7] Section 18 gives the landlord the option to terminate the lease if the damages are not covered by insurance and if the tenant declines to undertake the repair.

during the term of this Lease or any renewal or extension hereof."

In landlord's view, the opening sentence is simply a reiteration of landlord's obligation under the lease for the initial construction of the Landlord Improvements and does not impose a duty of repair. Tenant contends that the first sentence excludes the Landlord Improvements from tenant's repair obligation, the inference being that that obligation falls on landlord.

We agree that the first sentence of Section 17 is susceptible to an inference that landlord has responsibility for the repair of defects in the Landlord Improvements. But for several reasons, we conclude that that possible inference does not plausibly support a construction that landlord bears responsibility for repairs. First, as noted, it is a mere inference. Under the common law, a commercial landlord has no duty to make repairs absent a "special agreement." *McWilliams*, 269 Or at 528. A "special agreement" would seem to connote an explicit agreement rather than an inference. Second, the first sentence of Section 17 denotes landlord's obligation "regarding the initial construction of the Landlord Improvements." The lease does not define "initial construction" but it is clear, in the context of the agreement as a whole, that the "initial construction" is the construction of the Landlord Improvements that resulted in the certificate of occupancy and that, under Section 6, established the Rent Commencement Date. The cost of the initial construction determined tenant's Base Rent, which the lease contemplates will provide landlord an eight percent return on its investment. To impose on landlord an obligation for repairs of latent defects in the initial construction would increase landlord's costs beyond those that went into the calculation of tenant's Base Rent and would be inconsistent with the parties' intentions to provide landlord with an eight percent rate of return. It would also have the practical effect of creating a warranty for the initial construction where none is provided in the lease. We agree with landlord that, in the context of the agreement as a whole, there is no ambiguity created by the first sentence of Section 17, which we conclude does not assign to landlord responsibility for repairs but simply restates landlord's responsibility "regarding the initial construction."

Tenant asserts that, even in the absence of warranties or an express obligation to make repairs, in light of landlord's ownership and control of the premises, its obligation to build improvements for tenant's intended use, it's contractual relationship with the builder, and tenant's right under the lease to approve the terms and conditions of the construction contract, the lease as a whole makes it clear that the parties' expectations were to make landlord responsible for defects in the Landlord Improvements. We reject the contention. As noted, Oregon subscribes to the objective theory of contracts. *Dalton*, 209 Or App at 132. In ascertaining the meaning of the terms of a contract, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts. *Id*. In this case, the written lease states that it is integrated and embodies the parties' entire agreement.[8] *See Abercrombie*, 320 Or at 287-88. The various provisions of the lease cited by tenant simply do not impose on landlord an affirmative obligation to repair construction defects. We conclude that, in the absence of provisions either placing on landlord an obligation to make repairs or warranting the condition of the Landlord Improvements, there was no such obligation, and the trial court erred in granting tenant's motion for partial summary judgment and denying landlord's motion for partial summary judgment and in declaring "that Landlord is obligated to cause repairs to the Landlord Improvements to correct construction defects." The trial court further erred in awarding tenant attorney fees.

Reversed and remanded for entry of limited judgment for landlord on declaratory judgment claim.

**AOYAGI, J.,** concurring in part and dissenting in part.

I agree with the majority that the trial court erred in granting summary judgment for plaintiff tenant. The lease does not unambiguously require defendant landlord to remediate latent construction defects in the "Landlord

---

[8] The lease states:

"This document constitutes the entire agreement between the parties hereto and supersedes any prior agreement, verbal or written, and any prior representation, either implied or actual."

Improvements," so it was error to grant summary judgment for tenant. However, I disagree with the majority that landlord was entitled to summary judgment. The majority concludes that the lease is unambiguous that landlord has no obligation to remediate the latent defects, such that landlord was entitled to summary judgment. In my view, the lease is ambiguous, such that there is an open question as to who, if anyone, is contractually responsible to address latent construction defects in the Landlord Improvements. Accordingly, I agree that the judgment should be reversed and remanded, but, otherwise, I dissent.

The relevant facts are described in the majority opinion. In short, the parties entered into a build-to-suit commercial lease agreement, under which landlord agreed to purchase an old bank building, convert it for use as a fast-food restaurant, and lease it to tenant for 20 years or more. Under the terms of the lease, the build-out work constituted "Landlord Improvements." Both parties had to approve the plans and specifications for the Landlord Improvements. Both parties were to negotiate with the contractor selected to do the build-out, who was to be licensed and bonded. Landlord was to be the party who actually entered into the contract with the contractor, however, subject to tenant's approval of the contract terms. All went according to plan for a while—plans and specifications were agreed upon, a contractor was selected, landlord entered into a contract with a contractor that tenant approved, the build-out was completed, and tenant moved into the building and began paying rent.

After beginning operations, however, tenant discovered latent defects in the construction of the Landlord Improvements and asked landlord to remediate those defects. Landlord refused. For reasons unclear from the record, landlord declined to pursue a remedy against the contractor (who had warrantied to landlord that his work would be free of defects) or the contractor's insurer, instead essentially telling tenant that it was not landlord's problem. This action followed. The precise claims are described in the majority opinion, but, ultimately, tenant sought to hold landlord responsible to remedy the latent defects in the Landlord Improvements (and to confirm that it had no obligation itself

to remedy the latent defects), while landlord sought a declaration that it had no obligation to remedy any defects.

Whether a contract is ambiguous is a question of law. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 317, 129 P3d 773, *rev den*, 341 Or 366 (2006). We must examine the disputed term in the context of the contract as a whole and the circumstances of contract formation to determine whether it is susceptible to more than one "plausible" interpretation. *Adair Homes, Inc. v. Dunn Carney*, 262 Or App 273, 277, 325 P3d 49, *rev den*, 355 Or 879 (2014). If so, the contract is ambiguous; if not, it is unambiguous. *Id*. A contract provision "is unambiguous only if its meaning is so clear as to preclude doubt by a reasonable person." *PGF Care Center, Inc. v. Wolfe*, 208 Or App 145, 151, 144 P3d 16, 983 (2006) (internal quotation marks omitted).

Here, the trial court agreed with tenant that the lease unambiguously requires landlord to remediate latent construction defects in the Landlord Improvements (and that it places no obligation on tenant to remediate such defects) and, on that basis, granted summary judgment for tenant on tenant's declaratory judgment claim. On appeal, the majority not only disagrees with the trial court's interpretation of the lease but views it as implausible as a matter of law. The majority concludes that the lease unambiguously imposes no obligation on landlord to remediate latent construction defects in the Landlord Improvements, such that landlord was entitled to summary judgment.

When a contract dispute arises, one inevitably wishes that the parties had been clearer about what would happen in a particular situation. Of course, hindsight is 20/20. Here, it is uncertain whether or to what extent the parties foresaw the possibility of latent construction defects in the Landlord Improvements. Nonetheless, under the objective theory of contracts, we must interpret the contract they executed as best we can, including trying to discern how it applies to a situation that is not clearly addressed.

In my view, the contract is ambiguous as to whether landlord is responsible for remediating latent construction defects in the Landlord Improvements. Under Section 3.1, "[a]ll costs incurred for the Landlord Improvements

including without limitation the conversion and reconstruction * * * shall be paid by Landlord, other than the fees paid to the Architect." Under Section 3.2, the contractor selected to do the build-out must be "licensed and bonded," and landlord's contract with the contractor must be approved by tenant. And, under Section 17, Landlord has "no obligation to rebuild, replace, or make repairs of any nature, structural or otherwise, to the Premises or any improvements located thereon during the term of this Lease or any renewal or extension hereof," with two express exceptions: "[e]xcept as set forth in Section 18," which applies if the premises are "damaged,"[1] and "*except regarding the initial construction of the Landlord Improvements.*" (Emphasis added.)

Those provisions are sufficient, legally, to create an ambiguity as to whether landlord is responsible for remediating latent construction defects in the Landlord Improvements. An ambiguity is different than an "inference." *See* 313 Or App at 427. Under the lease, there is no question that landlord is responsible for constructing the Landlord Improvements, and there is no question that tenant is responsible for any repairs to the Landlord Improvements that become necessary due to normal wear and tear and the like. The lease is ambiguous, however, as to the scope of Section 17's exception for the "initial construction of the Landlord Improvements." That is particularly so when one considers other contract provisions. Section 3.1 requires the Landlord to pay for "[a]ll costs incurred for the Landlord Improvements including without limitation the conversion and reconstruction," except the architect fees. And Section 3.2 requires the contractor to be licensed and bonded and the contract terms between landlord and the contractor to be approved by tenant. There is little point in requiring the contractor to be insured (bonded), or in giving tenant approval authority over the contractor's warranty terms, if landlord has no obligation whatsoever to call upon that insurance or those warranties in the event of latent construction defects.

---

[1] It is not immediately apparent when Section 18 is meant to apply, but neither party argues that it applies to the situation here.

Thus, it is plausible to read the lease as making landlord responsible for the initial construction of the Landlord Improvements in accordance with the plans and specifications, including any latent defects in the initial construction, while making tenant responsible for any repairs to the Landlord Improvements that are necessitated by normal wear and tear and the like. I disagree with the majority that no reasonable person could read the lease as the trial court did. *See PGF Care Center*, 208 Or App at 151 (a contract provision "is unambiguous only if its meaning is so clear as to preclude doubt by a reasonable person" (internal quotation marks omitted)).

That said, landlord's alternative interpretation is also plausible. The contract does not squarely address the issue, which necessarily injects uncertainty. And Section 37 provides that tenant is executing the lease based on its own examination and personal knowledge of the value and condition of the premises, that landlord has not made any representations about the value, condition, or repair of the premises, and that tenant takes the premises "as is," "except as specifically set forth in this agreement." In context and given the circumstances of contract formation, I read that provision as referring to the conditions of the premises at the time of lease execution (before the build-out), but the majority takes a different view that would support landlord's proposed interpretation of the lease. 313 Or App at 425-27.

There is also the matter of the rent, which is to be calculated based on landlord's "total investment in the Real Property from the date of purchase to the Rent Commencement Date." As the majority notes, any expenses incurred by landlord after the Rent Commencement Date to repair latent construction defects in the Landlord Improvements would not be included in the rent calculation, which points in favor of landlord's position that it is not responsible for such repairs. *Id.* at 427-28. On the other hand, the parties expressly agreed that landlord would hire a "licensed and bonded contractor," and tenant exercised its contractual authority to approve a contract between landlord and the contractor that contained an express warranty against construction defects. Under the circumstances, it would have been reasonable for both parties to assume that,

if construction defects were discovered, the contractor or his insurer would be on the hook for the cost of any repairs, even if, between landlord and tenant, it was landlord's responsibility to ensure that the defects were remediated. Thus, the rent methodology may shed little or no light on the disputed issue.

Given the parties' failure to squarely address in their lease agreement who, if anyone, is responsible to remediate latent construction defects in the Landlord Improvements, and given the ambiguity in what the lease does say, I would conclude as a matter of law that the lease is ambiguous. Accordingly, I concur in the majority opinion insofar as it holds that the trial court erred in granting summary judgment for tenant. But, in my view, there remains an open question as to the correct interpretation of the lease, which should be resolved either through further summary judgment proceedings or by a factfinder at trial.[2] Instead, the majority concludes that landlord is entitled to summary judgment. I therefore respectfully dissent.

---

[2] In their respective summary judgment motions, landlord and tenant each took the position that the lease was unambiguous in its own favor. Neither party argued or sought to prove that, even if the lease was determined to be ambiguous, it was entitled to prevail as a matter of law due to extrinsic evidence of the course of performance, maxims of contract interpretation, or the like.