750 March 12, 2025 No. 213

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

AMERICAN CIVIL LIBERTIES UNION OF OREGON, INC.,
an Oregon non-profit public benefit corporation,
*Plaintiff-Respondent*
*Cross-Appellant,*
*and*

PROTESTER #1,
an individual,
*Plaintiff-Respondent,*

*v.*

CITY OF PORTLAND,
an Oregon municipal corporation,
*Defendant-Appellant*
*Cross-Respondent.*

Multnomah County Circuit Court
20CV27116; A178539

Thomas M. Ryan, Judge.

Argued and submitted September 11, 2024.

Denis M. Vannier argued the cause and filed the briefs for appellant-cross respondent.

Edward A. Piper argued the cause for respondent-cross appellant and respondent. Also on the brief was Angeli Law Group LLC.

Before Hellman, Presiding Judge, Lagesen, Chief Judge, and Mooney, Senior Judge.

MOONEY, S. J.

On appeal, portion of general judgment regarding contract claim reversed and remanded; otherwise affirmed; affirmed on cross-appeal.

### MOONEY, S. J.

The facts underlying this appeal and cross-appeal concern certain public protest activities that occurred in Portland[1] and the real-time transmission, or "livestreaming," of those activities over the internet by the Portland Police Bureau (PPB). Defendant-appellant, the City of Portland (City), and plaintiffs-respondents, Protester #1 and the American Civil Liberties Union of Oregon, Inc. (ACLU), stipulated to admissible facts and submitted the matter to the trial court on cross-motions for summary judgment. The trial court granted in part and denied in part each of the motions before it, essentially declaring that the City violated a state statute and breached a 1988 letter agreement when the PPB livestreamed the protests and related law enforcement activities on the internet.

The City appeals the general judgment which declares, among other things, that "[a]lthough brief and incidental, the 'caching' of data" that occurs during livestreaming means that "at least portions" of the livestreams in this case "violated ORS 181A.250" and "breached [the PPB's] obligations" under a 1988 letter from the then-City Attorney to then-counsel for the ACLU. The ACLU cross-appeals the trial court's ruling that it lacked standing to pursue its first claim for declaratory judgment.

We conclude that, by livestreaming the public protest activities, the PPB collected information about lawful protesters' political and social views in violation of ORS 181A.250. However, we also conclude that the 1988 letter to the ACLU's then-counsel from the then-City Attorney did not contractually obligate the PPB to comply with ORS 181A.250. Finally, we conclude that the trial court did not err in entering judgment against the ACLU on its first claim for declaratory relief on the basis that the ACLU lacked standing. We therefore reverse and remand for the trial court to enter a judgment consistent with this opinion.

---

[1] The protests in Portland, like many protests across the nation, occurred at least in part in response to the murder of George Floyd on May 25, 2020, in Minneapolis, Minnesota.

## STANDARD OF REVIEW

"On review of cross-motions for summary judgment, we view the record for each motion in the light most favorable to the party opposing it to determine whether there is a genuine issue of material fact and, if not, whether either party is entitled to [prevail] as a matter of law." *O'Kain v. Landress*, 299 Or App 417, 419, 450 P3d 508 (2019); ORCP 47 C. The parties stipulated to the admissibility, though not the relevance or materiality, of certain facts in the trial court, and that "all facts that are potentially material under ORCP 47 C and/or potentially relevant under OEC 401-02 for purposes of summary judgment" consist of those to which their stipulation applies. In other words, if those facts are determined to be relevant or material, the parties agreed that they would not otherwise object to the admissibility of those facts.

## THE FACTS

We draw the facts from the record and state them in accordance with our standard of review.

Beginning in May 2020, a number of public protests occurred in Portland after the death of George Floyd. In June and July, the PPB livestreamed ten of those public protests. "Livestreaming" refers to the transmission of video and audio data over the internet in real time. Per the parties' Joint Statement of Stipulated Facts, livestreaming is accomplished by a number of distinct steps: (1) a digital video camera records people and events, and the camera itself creates video and audio data that is then temporarily stored or "cached" on the device; (2) the data is compressed and sometimes segmented into discrete video files of short duration, then encoded, or converted, into file formats easily delivered over the internet; (3) the data is then transmitted to a central media server; (4) the video and audio data that will comprise the livestream is delivered to users via a central media server or a content delivery network for ease and efficiency of delivery; and (5) finally, that livestream is then received by a user's device, which decodes and plays the stream.

The PPB recorded the protests using one of three cameras. The recorded data was compressed and encoded

and sent through the internet to be livestreamed on the PPB's official YouTube account or, later, its Wowza account, where the livestreams were made available to the public through links that the PPB posted on Twitter (*nka* X). The public-facing broadcast was also viewed by the PPB in the Incident Command Post for situational awareness.

The PPB used YouTube for the first four live-streams. Those livestreams showed people engaged in public protest as well as related law enforcement activity, including declarations of unlawful assembly and orders to disburse in two of those livestreams. The livestreams concerned the political and social views, associations, and activities of the individuals they depicted. During each livestream, the video and audio data was stored by YouTube and accessible to the PPB. The PPB, however, did not at any point access the livestream data stored by YouTube. The PPB did not record, copy, review, maintain, or otherwise save any of the YouTube livestreams, and it did not create any logs or files about participants in the activities depicted in the live-streams. Each YouTube livestream was manually deleted by Sgt. Richard Steinbronn as soon as practicable after the livestream ended.

The PPB stopped using YouTube as a livestream platform when it learned that YouTube did not provide set-tings that would allow the PPB to turn off the automatic storage feature. It began using the Wowza platform because Wowza provided recording options for livestreams, and the PPB always selected the no-recording option, which obvi-ated the need for the PPB to delete livestreams once they were no longer live. The PPB used Wowza for the next six livestreams. Those livestreams showed people engaged in public protest as well as related law enforcement activity, including declarations of riot, declarations of unlawful assembly, the closure and clearance of certain public spaces, and orders to disburse. At least one of those livestreams depicted Protester #1. Those livestreams concerned the political and social views, associations, and activities of the individuals they depicted, including those of Protester #1. The PPB did not record, copy, review, maintain, or other-wise save the Wowza livestreams, and it did not create any

logs or files about participants in the activities depicted in the livestreams. Because no copies of the livestreams were made or retained, neither the trial court nor this court had the ability to review them.

In response to the livestreams, the ACLU filed a complaint for declaratory and injunctive relief, seeking a declaration "that ORS 181A.250 prohibits the City *** from livestreaming or otherwise recording video or audio of protesters demonstrating in public spaces." The complaint identifies both the ACLU as an organization and Protester #1 as plaintiffs, specifically alleging that the "ACLU's legal observers and other members have been (and will continue to be) among those at the protests who object to PPB's recording." According to the complaint and a declaration submitted by the ACLU's Deputy Director, legal observers "are trained volunteers who attend protests at the invitation of the events' organizer(s)" to document interactions between protesters and law enforcement for later review; however, they do not intervene in the event of a violation of law.

The ACLU also sought a declaration that, by livestreaming the protests, the PPB had breached a contractual obligation to comply with ORS 181A.250. The ACLU asserted that a 1988 letter addressed to its then-counsel, Elden Rosenthal, from the then-City Attorney, Jeffrey Rogers, was a valid and enforceable contract that prohibited the PPB from engaging in the conduct proscribed by ORS 181A.250. In 1988, several nonprofit groups reported to the ACLU that the PPB was photographing legal public demonstrations and maintaining the photographs and related information, including the identities of protesters, in permanent police files. The ACLU negotiated a resolution with the City, which is the subject matter of the letter. The ACLU contends that the letter represents a binding settlement agreement, while in the City's view, the letter simply memorialized ongoing discussions.

The opening paragraphs of the letter indicate that the City "accept[s]" the ACLU's "partial counter-proposal," and that the City "understand[s] that the [ACLU] and the [PPB] have agreed to the following resolution of this matter." The purported agreement contains four terms. The first

term provides that the ACLU "will not litigate over the collection of information by the [PPB] at demonstrations which have occurred prior to July 27, 1988." The second term provides, in full:

> "The [PPB] will formally adopt the following policy by amending its standard operating procedures for the criminal investigation division. The amended policy shall state:

> "[PPB o]fficers shall not collect or maintain information about the political, religious or social views, associations or activities of any individual, group, association, organization, corporation, business or partnership unless information directly relates to an investigation of criminal activities, and there are reasonable grounds to suspect the subject of the information is or may be involved in criminal conduct.

> "Any photographs or other tangible information taken or obtained at peaceful demonstrations in accordance with the above paragraph may be retained by the [PPB] for 30 days, during which time the [PPB] will be able to process police officer reports and review evidence, including any citizen complaints or charges of criminal misconduct, property damage, or other matters for which the photographs or information could constitute evidence. At the end of this 30-day period the photographs and information shall be destroyed by the [PPB] unless, at that time, there are reasonable grounds to suspect the subject of the information is or may be involved in criminal conduct and the photographs or information relate directly to a criminal investigation, in which case, the photographs may be maintained by the [PPB] as long as those conditions exist.

> "The [PPB] shall not collect or maintain information about the political, religious or social views, associations or activities of any individual, group, association or organization, corporation, business or partnership, solely for the reason that the individual, or individual members of a group, association, organization, corporation, business or partnership have been convicted of a crime, but the [PPB] may consider the relationship of the facts which supported the conviction to any current information in determining whether there are reasonable grounds to suspect the subject is or may be involved in criminal conduct."

The third term provides that the PPB will review its files "in light of the amended policy, to ensure that their contents

comply with the law and the amended policy adopted pursuant to this agreement." Finally, in the fourth term, the PPB "assures that they are not currently collecting or maintaining information" about the political associations or activities of specific individuals or organizations.

City Attorney Rogers concluded the letter by noting:

"I will be out of town from August 4th through August 15th. I hope that before my return you will be able to confirm this agreement. When I receive your confirmation upon my return, I will advise the [PPB] and they will amend their policy in accordance with this agreement."

Before the trial court, the parties agreed to a stipulated statement of facts, and filed cross-motions for summary judgment. As to the first claim regarding the violation of ORS 181A.250, the trial court concluded that the ACLU as an organization lacked standing, and thus, entered judgment in favor of the City and against the ACLU. However, the trial court also concluded that Protester #1 had standing to pursue the claim, and on the merits, concluded that the PPB had violated ORS 181A.250:

"Although brief and incidental, the 'caching' of data caused by the PPB-initiated livestreams identified in the [Joint Statement of Stipulated Facts], both when streamed to the public as well as when streamed to the PPB incident command center, amounted to a collection, but not maintenance, of information, about the political, religious or social views, associations or activities of individuals, groups, associations, organizations, corporations, businesses or partnerships prohibited by ORS 181A.250."

The trial court also concluded that the letter from the City Attorney to the ACLU director in 1988 "reflects a valid and enforceable contract" and that the PPB had breached its obligations under the contract when the PPB livestreamed the protests.

## CONSTRUCTION OF ORS 181A.250

We review the trial court's construction of ORS 181A.250 for legal error. *See Mouton v. TriMet*, 331 Or App 247, 251, 546 P3d 1, *rev den*, 372 Or 718 (2024).

ORS 181A.250 provides as follows:

"No law enforcement agency, as defined in ORS 181A.010, may collect or maintain information about the political, religious or social views, associations or activities of any individual, group, association, organization, corporation, business or partnership unless such information directly relates to an investigation of criminal activities, and there are reasonable grounds to suspect the subject of the information is or may be involved in criminal conduct."

The parties agree that the PPB is a law enforcement agency as defined by ORS 181A.010.[2] The parties also agree that the livestreams depicted some individuals engaged in lawful protest activity, and that by streaming the protests and the related response from law enforcement, PPB streamed activity that concerned the political and social views, associations, and activities of the individuals depicted. Thus, the question before us is narrow: whether the PPB collected or maintained information within the meaning of ORS 181A.250 when it livestreamed public protests and demonstrations as happened in Portland during the summer of 2020, and which necessarily included images of people who attended or participated in those events. When interpreting a statute, our task is to give effect to the intent of the legislature, and to do so, we first examine the statute's text and context, then consider the relevant legislative history to the extent it is useful to the analysis. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). If the legislature's intent remains unclear after examining the text, context, and relevant legislative history, we resort to general maxims of statutory construction. *Id.* at 172.

We begin with the plain text of ORS 181A.250. ORS chapter 181A does not define "collect" or "maintain" and the parties do not agree on the meaning of those terms. "When interpreting a statute, we give words of common usage their plain, natural, and ordinary meaning." *Hollister*, 305 Or App 368, 373, 470 P3d 436 (2020) (internal quotation marks omitted). We turn, then, to dictionaries, because "we presume that the ordinary meaning of [words will be] reflected"

---

[2] ORS 181A.010 provides, as relevant:

"(7) 'Law enforcement agency' means:

"(a) County sheriffs, municipal police departments, police departments established by a university under ORS 352.121 or 353.125 and state police[.]"

there. *Id*. Merriam-Webster defines "collect" to mean "to bring together into a band, group, assortment, or mass," "to bring together into one body or place," "to gain or regain control of," or "to bring together esp[ecially] in accordance with a principle of selection or an informative or profitable end." *Webster's Third New Int'l Dictionary* 444 (unabridged ed 2002); *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/collect (accessed January 29, 2025). Merriam-Webster defines "information" as "something received or obtained through informing[, such] as *** knowledge of a particular event or situation" and as "the communication or reception of knowledge or intelligence." *Webster's* at 1160.

Those definitions tell us that to collect information means to gather and control knowledge of a particular event or situation and to bring that knowledge into one place. Thus, the plain meaning of the term "collect" is quite broad and can be plausibly understood to encompass a livestream. The technological process involved in a livestream, per the parties' stipulation, involves the gathering of video and audio data, bringing that data together on a digital video camera within the PPB's control, where it is temporarily stored or 'cached,' and ultimately, transmitting knowledge about an event to the viewer of the livestream. The City contends that the plain meaning of the statute "bars police from gathering and compiling intelligence, or otherwise maintaining dossiers," about an individual's political views or associations. However, the plain statutory language does not narrow the term "collect" in the way that the City asserts. While a traditional intelligence file or dossier would indisputably constitute a collection of information, the terms "intelligence file" and "dossier" do not appear in the statute, nor does the plain meaning limit the meaning of collection to those types of files. Indeed, just as an intelligence dossier involves compiling data, a livestream similarly involves the compiling of data and the transmission of that data to a viewer for an informative end.

While the parties' arguments center on the meaning of "collect," we briefly discuss the plain meaning of "maintain." Merriam-Webster defines "maintain" to mean "to

keep in a state of repair, efficiency, or validity," and "to preserve from failure or decline." *Webster's* at 1362. Similarly, Black's Law Dictionary defines "maintain" in part to mean "to continue in possession of" and "to care for (property) for purposes of operational productivity or appearance." *Black's Law Dictionary* 1139 (12th ed 2024). Under that definition, the PPB would "maintain" a livestream only by retaining a recorded copy or otherwise cataloguing information depicted by the livestream. Thus, we conclude that "maintain" does not encompass a livestream that is not retained by the PPB.

We turn next to the statute's context and pertinent legislative history. The disputed statute was enacted in 1981 as part of House Bill (HB) 2682 (1981). In that bill, the legislature codified a standard to govern the release and disclosure of criminal record information to interested parties and defined the scope of the information that could be disclosed. For some legislators, that overarching policy objective raised a concern that the bill created a risk of "uncontrolled disclosure and accessibility to arrest records" that could "affect[] [an] individual's status—whether it's in school, his or her employment, [or] professional licensing[.]" Audio Recording, House Committee on Judiciary, HB 2682, Mar 20, 1981, at 06:12 (comments of Sen Kulongoski).

The legislature's concern regarding uncontrolled disclosure and access to individual criminal records was heightened by the prospect of "computerization." Then-Senator Kulongoski expressed concern that "each of us has a computerized dossier on ourselves" and that he "was amazed at how much information is in a computer on you." *Id.* at 06:19. The prospect that information could be easily digitized raised the potential that information would be more accessible and more permanent. Senator Kulongoski specifically warned: "And this information, via the computer, is accessible to employers, credit agencies, schools, licensing boards, and just a *** multitude of other agencies. It's been said before, that in essence, that once a person becomes—gets into the computer, it becomes a records prison." *Id.* at 06:24.

In addition to the concern about the disclosure of criminal history information, the legislature was also

concerned about the collection and maintenance of information about law-abiding individuals and organizations by law enforcement. The ACLU director at the time, Stevie Remington, advocated for the inclusion of Section 8, which would later be codified as ORS 181A.250. At a House Judiciary work session, she testified that current law did not provide any "guidelines" as to whether law enforcement could ever "collect and maintain" information about an individual's political and social views. Audio Recording, House Committee on Judiciary, HB 2682, Mar 20, 1981, at 04:08 (comments of ACLU Director Remington). Specifically, Remington described how information about an individual's political activity could be misused to harm that individual:

> "Those of you who have been around long enough may recall Captain Brown's Red Squad in the '20s, '30s, and '40s in the City of Portland who collected card files on thousands of individuals suspected of being subversive. One of the cards was the entire student body of the City of Eugene. Another was the YWCA Adelle Pickle Club, and a number of prominent citizens were on Captain Brown's card.
>
> "And this red squad literally went out regularly and gave information to employers and warned them against hiring those kinds of people. I have language if you're interested. And I think the time is ripe for considering a State law which says that you cannot collect and maintain—or maintain or disseminate information about a person's political, social, and political views unless you have reasonable reason to believe that they are engaged in criminal activity, and that that kind of information is necessary to pursue it. But we have no guidelines on this now."

*Id*.

At a later work session, Remington reiterated that the collection of information regarding an individual's political affiliations could cause serious harm:

> "Right now, there's an enormous federal lawsuit where there's been an incredible number of abuses against the Socialist Workers Party where not only did [law enforcement] collect all kinds of information, but they went out and informed landlords that this man is a member of the Socialist Workers Party, and you ought to kick him out of your house, and they have been. They have been fired from

employment because of law enforcement agencies collecting this data and urging private individuals to take action. That's enormous damage."

Audio Recording, House Committee on Judiciary, HB 2682, May 11, 1981, at 03:24 (comments of ACLU Director Remington). A state representative agreed that "it's very important that we give a clearer message to our police agencies about what we consider a proper role" and stated that "they don't need to be archivists for local groups." *Id.* at 05:25 (comments of unidentified state representative).

However, opponents of Section 8 warned that the provision could unnecessarily impede investigations conducted by law enforcement. Specifically, then-Attorney General Dave Frohnmayer expressed concern that prohibiting the "collection" of information would create practical problems for law enforcement because investigators often do not "know what it is that [they] are collecting until [they]'ve had a chance to *** assess it." Audio Recording, Senate Committee on Judiciary, HB 2682, July 22, 1981, at 18:19 (comments of Attorney General Frohnmayer). To that end, he advocated for the legislature to amend the provision to prohibit the permanent maintenance, as opposed to the mere collection, of the "investigative file," and further acknowledged that, "probably the most dangerous thing is to have that stuff computerized[.]" *Id.* at 27:09. Specifically, he suggested an amendment to allow law enforcement to retain the information for some period of time, possibly five years. *Id.* at 32:16. Senator Kulongoski opposed that suggested amendment, on the basis that, "if you put a five-year time limit, you're just giving a license to go out and collect that type of information." *Id.* at 34:16. Ultimately, the section as codified does not permit law enforcement to retain the information for any period of time.

The parties agree, as do we, that the above legislative history indicates that the legislature in 1981 did not contemplate whether livestreaming would be prohibited by the statute. However, "[t]he legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention." *State v. Nascimento*, 360 Or 28, 44, 379 P3d

484 (2016) (brackets in original; internal quotation marks omitted). While that principle does not require that we interpret statutes "in the broadest possible sense," *id.*, conversely, we are not required to construe the statute to encompass only the technology in existence in 1981. Certainly, by enacting ORS 181A.250, the legislature sought to prohibit law enforcement from compiling and maintaining an "intelligence file" or "dossier" regarding an individual's political activity. Importantly though, the legislature did not limit the applicability of ORS 181A.250 to the traditional intelligence file. On that point, we find it significant that the legislature was also concerned about how digitization amplified the risks associated with any documentation of an individual's political activity. The legislature ultimately chose to use broad language to describe the prohibited conduct, and we think that choice reflects an intent to encompass the use of technology in collecting and maintaining information. *See Hamilton v. Paynter*, 342 Or 48, 55, 149 P3d 131 (2006) ("[T]he statutory text shows that, even if the legislature had a particular problem in mind, it chose to use a broader solution.").

Here, we conclude that a livestream by law enforcement of a lawful protest collects information about protesters' political views and activities and therefore, constitutes conduct prohibited by ORS 181A.250. While a livestream that is not retained does not permanently digitize or archive that information, the livestream involves a collection of video and audio data that is "cached" on a device within the PPB's control. Once that data is organized and converted into a video stream, the PPB broadcasts it to the public and to its Incident Command. That process transmits information about a person's lawful political activity directly to the public, implicating the same type of harm the legislature sought to avoid by enacting ORS 181A.250, specifically that, by the actions of the PPB, information about an individual's political views and activities would be made accessible to third parties and might risk serious repercussions to that individual.

That the parties stipulated that "caching" is temporary storage, and that the PPB did not retain recordings of

the stream does not compel the opposite conclusion. Indeed, the legislature rejected any sort of retention period on the basis that it would simply invite law enforcement to collect information about a person's political views and associations. Livestreaming creates a digital reproduction of an individual's lawful protest that is then accessible to any member of the public. To put it simply, even if the digital reproduction is deleted after it is made, the statute prohibits law enforcement from creating the reproduction in the first place. Even though the livestreams were made available for only a short period of time, they were accessible for use by both the public and the PPB Incident Command.

Finally, we reject the City's argument that, "[a]t most, what was being 'collected' was disembodied bits of digital data inside an electronic device, for seconds or fractions of seconds, without the broadcaster having any control or access to them before they were erased by the next incoming bit of digital data." In the City's view, to the extent the PPB collected anything, it collected uninterpretable data, as opposed to information about protesters' political views. However, we see no practical distinction between the data inside the electronic device and the livestream itself. The collection of the "disembodied data" that the City describes is the very process by which the data is organized into an image and video that is transmitted to the viewer of a livestream. And as the City stipulated, the livestreams showed individuals engaged in lawful protest activity. We therefore conclude that the trial court did not err in concluding that ORS 181A.250 prohibited the PPB from livestreaming public demonstrations.

### THE LETTER AGREEMENT

"Whether a contract exist[s] is a question of law." *Ken Hood Construction v. Pacific Coast Construction*, 201 Or App 568, 577, 120 P3d 6 (2005), *adh'd to as modified on recons*, 203 Or App 768, 126 P3d 1254, *rev den*, 341 Or 366 (2006). Similarly, "[c]ontract interpretation presents a question of law that we review for legal error." *Santoro v. Eagle Crest Estate Homesite Owners Assn.*, 319 Or App 793, 798, 512 P3d 828 (2022).

The City argues that the letter is not an enforceable contract for two independent reasons: first, the agreement was not authorized by the City Council as required by the City charter, and second, on its face, the letter does not purport to be a final, binding contract. Even if it is a contract, the City argues that the terms of the contract only obligate the PPB to amend its internal policy and that "nothing in its terms obliges [the] PPB not to collect or maintain information on an ongoing basis." The ACLU responds that the letter is a valid contract: first, *former* Portland City Code (PCC) 3.10.070[3] has authorized the City Attorney to enter into settlement agreements that do not require payment by the City in excess of $5,000, and second, the letter, read as a whole, purports to be a binding agreement. The ACLU also contends that the letter agreement "prohibited the City as a contractual matter from violating ORS 181A.250" and that the PPB's livestreams amounted to a breach. We conclude that, to the extent that the letter reflects a valid and enforceable contract, the PPB did not breach its obligations therein because by the letter's very terms, the PPB agreed only to amend its internal policies and it did not, as a matter of contract, agree to comply with ORS 181A.250 in perpetuity.

When interpreting a contractual provision, our task is to "ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]" ORS 42.230. In doing so, we follow a three-step analysis. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). First, we examine "the text of the disputed provision, in the context of the document as a whole" to determine whether the provision is ambiguous. *Id.* "A contract provision is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is capable of more than one plausible and reasonable construction." *Cryo-Tech, Inc. v. JKC Bend, LLC*, 313 Or App 413, 423, 495 P3d 699 (2021), *rev den*, 369 Or 211 (2022). If the provision is unambiguous, the analysis ends. *Yogman*, 325 Or at 361. If, however, the provision is ambiguous, we next examine extrinsic evidence of the contracting parties' intent. *Id.* at 363. Finally, if the first two

_____

[3]  PCC 3.10.070 has since been renumbered as PCC 3.10.060 and was amended in 2025.

steps have not resolved the ambiguity, we rely on appropriate maxims of construction. *Id.* at 364.

Here, the parties dispute whether the second term of the letter agreement incorporates ORS 181A.250 and accordingly, whether it contractually obligates the PPB to comply with that statutory provision. The ACLU, relying in part on *Coats v. ODOT*, 188 Or App 147, 71 P3d 172 (2003), *rev den*, 336 Or 509 (2004), contends that because the terms of the contract incorporated ORS 181A.250, the PPB "promised more than a mere policy update." In *Coats*, we held that a contractual provision that required the plaintiff to "comply with all laws, ordinances, codes, regulations and rules *** that relate to the work or to those engaged in the work" unambiguously included certain administrative rules relating to the prevailing wage rate for workers involved in public works projects. 188 Or App at 151 (ellipsis in original; internal quotation marks and brackets omitted).

We conclude that the disputed term unambiguously obligated the PPB to amend internal PPB policy but that it did not incorporate ORS 181A.250. Beginning with the text of the contractual provision, the disputed term explicitly provides that the PPB "will formally adopt the following policy by amending its standard operating procedures for the criminal investigation division." The term then provides the text of the amended policy. As the ACLU emphasizes, the first paragraph of the amended policy language tracks the language of ORS 181A.250 nearly verbatim, even though the statute is not explicitly referenced within the letter agreement. However, the amended policy language includes additional provisions, specifically that the PPB will follow a process for reviewing and purging information obtained in compliance with the amended policy and that the PPB will not collect information about an individual's or organization's political or social views solely based on a prior criminal conviction. The language that mirrors ORS 181A.250 does not exist in isolation, but rather, appears as part of a broader description of the PPB's plan to change its operating practices.

At most, the agreement requires the PPB to incorporate ORS 181A.250 *into its policies*, but the agreement does

not incorporate ORS 181A.250 *into the contract* itself. For that reason, this case is distinguishable from *Coats*. There, the pertinent administrative rule was unambiguously incorporated by reference within a contractual term, whereas in this case, the disputed term contains no reference to any law or to the specific statute. Rather, the term promises to amend its internal policies, and the language similar to the statute appears within the agreed-upon amendment.

The ACLU also argues that the third term of the contract, which provides that the PPB will review its files and ensure "that their contents comply with the law and the amended policy" incorporates ORS 181A.250. However, that provision promises that the PPB will ensure its *existing* files are compliant with ORS 181A.250, and it does not impose a prospective obligation on the PPB. On that point, we emphasize that our construction of the contractual provisions does not relieve the PPB of its obligation to comply with ORS 181A.250. The PPB's obligation to comply with state law predates the letter agreement and continues notwithstanding our determination that the requirements of ORS 181A.250 were not incorporated into the contract. Because the record before us does not contain any evidence that the PPB failed to amend its policy per the agreement, we reverse the trial court's declaration that the City breached the terms of the 1988 letter.

## STANDING

Finally, we turn to the ACLU's cross-assignment of error, in which it contends that the trial court erred by denying its motion for summary judgment on the basis that the ACLU lacked standing to pursue its first claim alleging that the PPB had violated ORS 181A.250 by livestreaming the public demonstrations. We conclude that the trial court did not err in concluding that the ACLU lacked standing, and accordingly, we affirm.

"Whether a plaintiff has standing to bring a declaratory judgment action is a legal question, which we review for legal error." *Oregon Restaurant and Lodging Assn. v. City of Bend*, 313 Or App 772, 777, 497 P3d 306 (2021).

"'Standing' is a legal term that identifies whether a party to a legal proceeding possesses a status or qualification necessary for the assertion, enforcement, or adjudication of legal rights or duties." *Kellas v. Dept. of Corrections*, 341 Or 471, 476-77, 145 P3d 139 (2006). To determine whether a party has standing, we examine the statute under which the party has invoked judicial review. *Id.* at 477 ("[S]tanding is not a matter of common law but is, instead, conferred by the legislature." (Internal quotation marks omitted.)). Here, the ACLU sought declaratory relief under the Uniform Declaratory Judgments Act (DJA), which provides, as relevant:

> "Any person *** whose rights, status or other legal relations are affected by a constitution, statute, municipal charter, ordinance, contract or franchise may have determined any question of construction or validity arising under any such *** constitution, statute, municipal charter, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

ORS 28.020. The DJA defines "person" as "any person, partnership, joint stock company, unincorporated association or society, or municipal or other corporation of any character whatsoever." ORS 28.130. There is no dispute that the ACLU qualifies as a "person" within the meaning of ORS 28.130.

To establish standing under the DJA, a plaintiff must show that its claim meets three requirements. *MT & M Gaming, Inc. v. City of Portland*, 360 Or 544, 554, 383 P3d 800 (2016). First, the plaintiff must establish that the challenged law "causes some injury to or impact upon a legally recognized interest of the plaintiff's, beyond an abstract interest in the correct application or the validity of the law." *Id.* (internal quotation marks and brackets omitted). Second, the claimed injury or impact must be "real or probable, not hypothetical or speculative." *Id.* at 555. Third, the plaintiff must show that the decision by the court "will in some sense rectify the injury, *i.e.*, that it will have a practical effect on the rights that the plaintiff is seeking to vindicate." *Id.* (emphasis in original; internal quotation marks omitted).

As to the first requirement of standing, if the plaintiff belongs to a class of persons to whom a statutory

duty is owed, and the plaintiff claims injury based on an alleged violation of that duty, the plaintiff has demonstrated an injury to a legally recognized interest. *Doyle v. City of Medford*, 356 Or 336, 372, 337 P3d 797 (2014). Put differently, "the statute's intended beneficiary[] has standing to seek a declaration as to the statute's validity, meaning or effects." *MT & M Gaming, Inc.*, 360 Or at 563. For example, in *Doyle*, the plaintiffs were retired employees of the City of Medford who elected to continue the health insurance coverage that the city had provided to them as employees pursuant to ORS 243.303(2), but the city declined to make that coverage available. *Doyle*, 356 Or at 339. The court held that the plaintiffs had satisfied the first standing requirement: under the statute, the City of Medford was obligated, to the extent possible, to provide the plaintiffs with health coverage, and the plaintiffs alleged that they were unable to access those benefits as a result of the city's conduct. *Id.* at 372.

Even if a plaintiff is not the intended beneficiary of the statute, a person whose interests "are within the statute's broader purposes," also has standing to bring a declaratory judgment action with respect to the statute. *MT & M Gaming, Inc.*, 360 Or at 563. For example, in *League of Oregon Cities v. State of Oregon*, the plaintiffs challenged a voter-approved initiative that would have required local governments to compensate private real property owners for the cost of regulations that affected the value of their land. 334 Or 645, 649, 56 P3d 892 (2002). The court held that two of the plaintiffs had standing to challenge the initiative: (1) a rancher who testified that if the county waived certain land use regulations to avoid compensating affected landowners, parcels of land surrounding his farm would likely be developed for residential or commercial use, jeopardizing his farm and income; and (2) a town mayor, who asserted in an affidavit that his home would decrease in value if the county permitted a neighbor to develop a mine on their property to avoid compensating that landowner under the measure. *Id.* at 660-61. Although the initiative measure did not directly apply to those plaintiffs, "the plaintiffs alleged that their land values and other financial interests were affected indirectly, by the measure's operation on state and local

governments." *MT & M Gaming, Inc.*, 360 Or at 557 (discussing the holding of *League of Oregon Cities*). That indirect effect was sufficient to "demonstrate[] that the measure would adversely affect their 'legally cognizable interests' and that the plaintiffs therefore had standing." *Id.*

While a direct or indirect injury to a legally recognized interest may be sufficient to satisfy the first requirement, we have explicitly held that the DJA does not authorize "representational standing." *Oregon Taxpayers United PAC v. Keisling*, 143 Or App 537, 544, 924 P2d 853, *rev den*, 324 Or 488 (1996), *cert den*, 520 US 1252 (1997). In short, the DJA "does not allow an organization to assert the rights of its members." *Id.* In *Oregon Taxpayers United PAC*, a political action committee sought a declaration "that certain statutes that require the disclosure of the identities of individuals who contribute to ballot measure campaigns are unconstitutional." *Id.* at 539. The committee acknowledged that it was not attempting to vindicate its constitutional rights as an organization, and rather, sought to vindicate the constitutional rights of its contributors. *Id.* at 544. The court held that the text of ORS 28.020 does not mention representational standing and the court did not have authority to insert that language into the statute. *Id.* at 542-43. Instead, ORS 28.020 requires that the person bringing the action be affected by the challenged statute, and therefore, the committee itself lacked standing. *Id.* at 544-45.

The City argues that *Oregon Taxpayers United PAC* forecloses the ACLU's argument that it has standing to challenge the PPB's livestreams as a violation of ORS 181A.250. In response, the ACLU affirms that it does not claim representational standing, and rather, contends that this case is legally and factually distinguishable because *Oregon Taxpayers United PAC* did not consider the statute at issue in this case, ORS 181A.250, and because the individual contributors to the committee in that case "had no legal relationship with the PAC." Instead, as a corporation, the ACLU acts through individuals that act on its behalf. In its view, for purposes of ORS 181A.250, the legal observers present at the demonstrations were acting as the ACLU, and therefore, their objection to the livestream and the potential

that the observers' images might be broadcast via that livestream is sufficient to establish that the PPB's violation of ORS 181A.250 caused injury to the ACLU itself, which necessarily confers standing on the ACLU as an organization. We disagree.

First, we reject the ACLU's argument that *Oregon Taxpayers United PAC* is legally inapposite on the basis that it did not consider ORS 181A.250. It is true, as the ACLU emphasizes, that "when considering issues of standing under a given statute, we do not rely on general pronouncements about standing drawn from cases involving different statutes." *MT & M Gaming, Inc.*, 360 Or at 554. However, both the ACLU and the committee in *Oregon Taxpayers United PAC* sought relief under the same statute, the DJA. Indeed, the challenged statutes in *Oregon Taxpayers United PAC* explicitly governed political action committees by requiring them to keep certain records about their contributors and to file reports with the Secretary of State. Similarly, here, there is no dispute that the ACLU is a corporation that qualifies as a person within the meaning of ORS 181A.250. However, that is not sufficient by itself to establish standing. Put differently, that the ACLU is among the intended beneficiaries of ORS 181A.250 is insufficient to confer standing absent an injury or adverse effect, whether direct or indirect, to the ACLU's statutory rights therein. Thus, as in *Oregon Taxpayers United PAC*, the ACLU cannot demonstrate standing simply by asserting the rights of its members, and rather, it must show injury to the ACLU as an organization.

We conclude that the ACLU has failed to do so. In the proceedings below and in its briefing, the ACLU identifies two alleged injuries to its legal observers: (1) they are present at the demonstrations and object to the PPB's livestream, and (2) the livestream creates a substantial risk that the observers' images may be broadcast via the livestream. To start, the fact that a legal observer *objects* to the livestream is not itself sufficient to confer standing on the ACLU. A mere objection to a government practice does not constitute an injury to a legally recognized interest beyond an abstract interest in the correct application or the validity

of a law. *Morgan v. Sisters School District #6*, 353 Or 189, 195, 301 P3d 419 (2013) ("It is not sufficient that a party thinks an enactment or a decision of a government entity to be unlawful. The standing requirements of ORS 28.020 require that the challenged law must affect *that party's* rights, status, or legal relations." (Emphasis in original.)).

As to the potential that a legal observer's image could be broadcast via the livestream, the record is devoid of any evidence that shows an adverse effect on the ACLU as an organization if the observer was depicted in the livestream. More specifically, the record does not contain any evidence that that image could or would be connected to the ACLU or that the individual could even be identified specifically as a legal observer, as opposed to a protester. Without any such evidence, the ACLU has failed to identify a direct or indirect effect on its legally recognized interests, and therefore, lacks standing to pursue its first claim for declaratory relief. The trial court did not err in holding that the ACLU lacks standing.[4]

## CONCLUSION

In conclusion, ORS 181A.250 prohibits the PPB from livestreaming lawful public demonstrations because such livestreaming constitutes a collection of information prohibited by the statute. We thus affirm the trial court's construction of ORS 181A.250. However, the trial court erred by concluding that the PPB had breached its obligations under the 1988 letter agreement. To the extent that the letter is an enforceable contract, it did not contractually obligate the PPB to comply with ORS 181A.250, and rather, the PPB only promised to amend its internal policies. Finally, the trial court did not err in concluding that the ACLU lacked standing to bring its first claim because the ACLU failed to demonstrate a direct or indirect injury to a legally recognized interest. We therefore reverse and remand for the trial court to enter a judgment consistent with this opinion.

---

[4] The ACLU also argues that it had a contractual right to pursue declaratory relief against the City to enjoin the PPB from engaging in activities prohibited by ORS 181A.250. However, because we conclude that the letter agreement did not incorporate ORS 181A.250, the letter agreement does not confer standing on the ACLU.

On appeal, portion of general judgment regarding contract claim reversed and remanded; otherwise affirmed; affirmed on cross-appeal.